# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| *MICHAEL D. LUNDY*, et al., | ) | |
| **Plaintiffs,** | ) | |
| v. | ) | **Case No. 02-189-CV-W-2** |
| *GUY M. HILDER*, et al., | ) | |
| **Defendants.** | ) | |

## INDIVIDUAL PLAINTIFFS' TRIAL BRIEF

Pursuant to § II.12 of the **Third Amended Scheduling and Trial Order,** this is the trial brief of the individual plaintiffs Michael D. Lundy, Jayne Lundy, Sadie Lundy, and S. Turner Allen (the "Individual Plaintiffs").

## I. EVIDENCE

The plaintiffs expect to adduce the following evidence:

### Early 2001 – Optimation/SimplyIP/Panorama Merger Agreement

For some 24 years and into January and February 2001, Optimation, Inc. ("Optimation") was an Oklahoma certificated corporation, operating a software development and sales enterprise with all of its material business operations conducted for several years at 300 N. Osage in Independence, Missouri. Plaintiff Michael D. Lundy, ("Lundy") was a founder and the current President of Optimation. Plaintiff S. Turner Allen ("Allen") was Chairman of the Board of Directors. The Individual Plaintiffs and their immediate families held approximately 32% of the Optimation stock.

In and after January and February 2001, Optimation was short on cash and had insufficient operating capital to pay its current obligations as those obligations came due, such that it was "insolvent" under state law. Members of the management of Optimation (to include Lundy and Allen) were negotiating with the McNeall Investment Group a

written agreement known as the "Principal Points Agreement" that was an initial agreement for merger and capital investment transaction by which McNeall Investment Group would arrange an investment loan of $5 million into a merged company that would hold certain enterprises and assets of three corporations, Optimation, Inc. ("Optimation"), SimplyIP, Inc. ("SimplyIP") and Panorama!, Inc. (the "Optimation/SimplyIP/Panorama Merger" or "the Merger"). After the Merger, through the corporate shell of Optimation, Optimation was to hold the assets of and operate the enterprises of all three corporations. At the inception of negotiations, the "McNeall Investment Group" was a joint venture consisting of Michael E. McNeall ("McNeall"), Dwight Huff ("Huff"), Alan W. Targgart and certain affiliates.

SimplyIP and Panorama!, Inc. did not have the $3 to 5 million in investment capital needed to fund the Optimation/SimplyIP/Panorama Merger and business plan after the Merger. In part, what the McNeall Investment Group was to contribute through the Merger were large contracts to develop and install software in the title insurance industry, contracts projected to yield up to $27 million of revenue. P Trial Exs. 39, 40. To raise needed investment capital, the McNeall Investment Group made contact with venture capital firms in Austin, Texas. In February and March 2001, the McNeall Investment Group was working with Oxford Corporate Finance on a $1.5 million investment in the Optimation/SimplyIP/Panorama Merger. In March or April 2001, McNeall made a contact with defendant Guy Hilder ("Hilder", the reference will sometimes also include the Hilders' companies - defendants GMH Businesses, L.C. and GMH Business Group). Hilder presented himself as an investor and capital raiser with experience in public stock offerings, who had millions of dollars of his own funds to invest, who had partners ready

to invest millions of dollars in the Merger, and who had access through certain "natural resource bonds" issued by foreign governments, to hundreds of millions of dollars of investment capital.

Hilder stated that he and his partners would not be interested in investing in the merger with other outside investors. In April 2001, Hilder executed agreements with McNeall and his companies to pursue the Merger. One of those agreements provided for Hilder "representing GMH Business, L.C." to advise and assist SimplyIP with "Corporate Finance, Project Funding, Structured Finance, Mergers and Acquisitions, Long Term Financial Planning and Corporate Earnings Programs." P Trial Ex. 30. Other agreements provided for Hilder to act as Chief Financial Officer (CFO) and Chief Executive Officer (CEO) of SimplyIP with a combined base salary of $30,000 per month. P Trial Nos. 36, 47. In April 2001, the McNeall Investment Group paid Hilder $30,000 for his services. P Trial Nos. 43.

Hilder expressed an interest in making a personal investment of over $4 million in the Optimation/SimplyIP/Panorama Merger. On April 9, 2001, Hilder represented in writing that he would make an immediate cash investment of $2 million and arrange a $2 million line of credit within a few weeks. P Trial Ex. 32. In his April 9 letter Hilder stated:

> I will forward to you the letter of intent to provide funds for the merger later this week along with the background summary on GMH Businesses. I will outline what areas of business that I expect to be involved, along with general information concerning GMH Businesses. I am sure that both *will serve to ensure your associates* that the merger is moving forward to a close and that the company will enjoy a healthy financial future. (Emphasis added.)

The reference to "associates" is a reference to the Optimation management and others affiliated with the three merging companies who were seeking assurance that Hilder and GMH Businesses could perform.

In return for this investment, Hilder stated that he wanted to be CEO and CFO, and wanted 20 to 30% of the stock of the post-merger corporation. During April 2001, Hilder made his communications to Optimation about the Optimation/SimplyIP/Panorama Merger through McNeall. Given Hilder's representations about having millions of dollars to invest in of his own and other investors, the Optimation management and McNeall Investment Group were concerned about Hilder's ability to bring an investment of that size. When McNeall and Huff questioned Hilder about his financial wherewithal, Hilder would represent that he had large investment accounts and partners, and that he had millions of dollars of liquidity to make the investment. During this litigation Hilder has never produced any documents showing any of his own investment accounts, any investment partners, or any other documents showing a commitment to make the investment.

After SimplyIP and defendant GMH Businesses, L.C. ("GMH Businesses") made the agreements for Hilder to act as CFO/CEO, Hilder became active in the negotiation of the Principal Points of Agreement with drafts forwarded to Hilder for his review, and Hilder making changes and returning the document. P Trial Ex. 42. After negotiations over the key terms of an Optimation/Simply/IP/Panorama Merger, representatives of the three corporations agreed in May 2001 on the version of the Principal Points of Agreement that is included as a part of the Proxy Materials marked as P Trial Ex. 52. By that time, because of its cash shortages, Optimation owed employment taxes, delinquent 401k Plan contributions, back rent and loan payments to UMB Bank. The Principal Points of Agreement had several exhibits among which was an "Exhibit F and H" that itemized the outstanding debts and other obligations of Optimation that were to be paid using current Optimation cash flow (from operations through the time of a closing on the Merger),

some borrowed funds, and the investment funds to be provided by Hilder.  P Trial Ex. 52.
On May 3, 2001, Hilder wrote that he was forwarding a written commitment letter for the
investment in the Optimation/Simply IP/Panorama Merger and wanted to receive the
executed Principal Points of Agreement.  P Trial Ex. 75.  On or about May 3, 2001, on
behalf of SimplyIP and Panorama!, Inc., the directors of those corporations executed and
delivered to Optimation the Principal Points Agreement.

During the second week of May 2001, Hilder came to Independence to look at the
business operations of Optimation and to announce his role in taking over management of
Optimation to move it toward completing the Merger.  Hilder appeared at a company
barbeque and spoke to the employees about taking over management of Optimation and
his commitment to fund the Merger, to include providing funding under the Principal
Points Agreement.

On May 16, 2001, the duly elected members of the board of directors of Optimation
were James H. Henson, Glen E. Henson, Lundy and Allen. (the "Optimation BOD").
Allen was the Chairman of the Optimation BOD.  Based on Hilder's commitment to fund
$5 million for the Optimation/SimplyIP/Panorama Merger, Optimation BOD agreed to
appoint Hilder as Chief Executive Officer (CEO) and Chief Financial Officer (CFO) of
Optimation so that he would provide an immediate cash infusion to the cash-strapped
company.  Based on provisions in the Optimation Bylaws (P Trial Ex. 2), regarding the
calling of shareholder meetings, and in anticipation of the need to call a shareholders'
meeting to vote on the Merger, the Optimation BOD resolution appointing Hilder as CEO
and CFO specifically reserved to Lundy the office of President.  P. Trial Ex. 48.  The
Resolution stated "that Guy Hilder be and he is hereby unanimously elected to the

positions of CEO and CFO, with Michael D. Lundy retaining the office of President until the merger is completed. . . "  The May 16, 2001 Resolution appointing defendant Hilder as CEO and CFO of Optimation also appointed McNeall as its Chief Operating Officer (COO).    P. Trial Ex. 48.    Hilder and McNeall thereafter undertook to control the enterprises and assets of Optimation and held themselves out to be said designated officers of Optimation.

The Principal Points Agreement set forth certain **prerequisites** to the Merger.  One, the Principal Points Agreement provided for negotiation of a final Merger Document that was to be completed and distributed to shareholders before a May 17, 2001 shareholder vote to approve the Merger.  The Principal Points of Agreement stated, "[a]ll of the terms of the Merger Document must be agreed to at this meeting."  P Trial Ex. 52, PPoA p. 2 of 10.  Two, the Principal Points Agreement required 66 2/3% shareholder approval of an increase of the authorized common stock from 5 to 30 million shares of common stock, of the issuance of 10 million shares of preferred stock, and of new articles of incorporation and bylaws prior to a shareholder vote to approve the Optimation/SimplyIP/Panorama Merger at a May 17, 2001 annual meeting of the Optimation shareholders.  P. Trial Ex. 52, PPoA p. 1-2 of 10.

Under the heading of "Control of merged entity" in the Principal Points Agreement, the document provided, "McNeall and his investor partners will obtain majority control of the newly merged enterprise though this proposed merger."  The reference to "investor partners" was principally a reference Hilder because of his agreement to provide $3 million of cash for Optimation debts and other payments, and a $2 million of credit.  P. Trial Ex. 52, PPoA p. 3 of 10.

Various delays had occurred during merger negotiations and the Hilder management transition process. The prerequisites set out in the Principal Points of Agreement were not completed. No shareholders' meeting was called for May 17.

Shortly before Hilder was appointed as Optimation's CEO and CFO, Hilder and defendant Susan Hilder took over control of the day-to-day operations of the company from their home in Austin, Texas. Hilder required that all company activities be reported to him. Hilder made all final decisions on Optimation business affairs. Hilder directed that incoming checks from Optimation customers be sent to his home in Austin. The Hilders would then make decisions about which creditors to pay and when, and about when to fund payroll. At the time the Hilders took control of Optimation's cash flow, the Exhibits F and H to the Principal Points of Agreement showed over $1 million of Optimation indebtedness that was to be paid using the $5 million Hilder and GMH Businesses were to invest.

### Solicitation and Alleged June 28, 2001 Use of Proxies by Hilder

Hilder insisted that a condition of the GMH investment was to be given proxies by Optimation shareholders to vote for the Merger. On June 7, 2001, McNeall and Hilder caused distribution of a package of "Proxy Materials" to Optimation shareholders. P Trial Ex. 52. The Proxy Materials included written representations by the McNeall Investment Group about completing the proposed Optimation/SimplyIP/Panorama Merger according to the provisions of the Principal Points of Agreement. Hilder directed the solicitations of proxies from the individual plaintiffs and other Optimation shareholders (the "Shareholder Proxies").

The shareholder proxy form distributed on June 7, 2001, gave Hilder the following authority with respect to voting for the Optimation/SimplyIP/Panorama Merger:

> Irrevocable Proxy in granted to Mr. Guy M. Hilder to vote in special meeting of the stockholders of Optimation concerning the acceptance of the final Merger Agreement between Optimation and Simply IP detailing and following the guidelines set forth in the Principal Points of Agreement signed and fully executed by members of the board of directors of both companies. A copy of which is included with this Exhibit A.

The shareholder proxy format and the Exhibit A to that format are a part the Proxy Materials marked as P Trial Ex. 52.  The shareholder proxy form also gave Hilder the authority to vote in a special meeting of the Optimation shareholders for election of a new Board of Directors for Optimation, new Articles of Incorporation for Optimation, and new Bylaws for Optimation, all "as a part of the final merger of Optimation and Simply IP."  The shareholders proxy form did not provide for any waiver of the shareholders' right to receive a notice of the special shareholders' meeting at which the proxy would be voted.  P Trial Ex. 52.  The shareholder proxy form did not include any identification of the individuals nominated for election to the Board of Directors, and at that time no nominations had been made.  True and genuine copies of the executed Shareholder Proxies that the Individual Plaintiffs signed and delivered are marked as P Trial Ex. 53.

### A Purported June 28, 2001 Special Shareholders' Meeting

Hilder claims that on June 28, 2001, he used the Shareholder Proxies to vote at an Optimation special shareholders' meeting to approve the Optimation/SimplyIP/Panorama Merger, to elect a new board of directors, and to adopt new articles of incorporation and bylaws.  P Trial Ex. 59.  As part of the representations Hilder made to McNeall and Huff

to persuade them Hilder had the authority to take unilateral shareholder and board actions, Hilder represented (i) he had the $5 million of investment funds described in the Principal Points of Agreement and he was going to invest the funds, and (ii) he was going to take Optimation "public" and that he had already met with UBS/Paine Webber about a public offering. As to the statements about a public offering and UBS/Paine Webber, *see* P Trial Ex. 65. During this litigation Hilder has never produced a final Merger Agreement between Optimation, SimplyIP and Panorama!, Inc., or any documents showing any contact with UBS/Paine Webber or any other potential underwriter about a public offering.

On June 28, 2001, Section 6 (Special Meetings) of the Optimation Bylaws (P Trial Ex. 2) provided in relevant part:

> . . . special meetings of the shareholders of the Corporation may be called only by the Chairman of the Board, the President of the Corporation or the Board of Directors pursuant to a resolution approved by a majority of the whole Board of Directors.
>
> The "call" and "notice" of any such meeting shall be deemed to be synonymous.

On June 28, 2001, Lundy was President, Allen was Chairman of the Board, and the Optimation BOD consisted of James H. Henson, Glen E. Henson, Lundy and Allen. Neither the President, the Chairman of the Board nor the Board of Directors called any special shareholder's meeting for June 28, 2001. Because none of the three authorized meeting callers called a meeting, the corporation did not give written notice given to Optimation shareholders about such a meeting. There was no opportunity for the Optimation shareholders to learn of proposed shareholder actions, or to determine whether proposed actions were consistent with the Shareholder Proxies, or lawful.

The Optimation Bylaws also provided that "only such business shall be conducted at a special meeting as shall be brought before the meeting pursuant to the Corporation's notice of the meeting" and the notice of meeting shall be written stating the place, date and hour of the meeting, and in the case of a special meeting, the purpose or purposes of the meeting. P Trial Ex. 2, § 12. The Bylaws require that the notice of the meeting be sent to all shareholders not less than 20, nor more than 60 days before the meeting. *Id.* No notice of a June 28 meeting was prepared.

On June 28, 2001, Article Six, Section 9 of the Restated Certificate of Incorporation (14 Apr 92) (P Trial Ex. 2) for Optimation provided that:

> Advance notice of nominations for election of directors, other than by nominations by the Board of Directors or a committee thereof shall be given to the Corporation in the manner provided in the Bylaws.

No nominations for directors were made for a June 28 shareholders' meeting.

The corporate forum that Hilder claimed to have used via the Shareholder Proxies to approve the Merger, an election of a new board of directors, and adoption of new articles of incorporation and by laws was a "written consent" in lieu of a formal meeting. P Trial Ex. 59. On June 28, 2001, Article Fifteen, Section 1 of the Restated Certificate of Incorporation (14 Apr 92) (P Trial Ex. 2) for Optimation prohibited written consents in lieu of meetings, providing that:

> [N]o action required or permitted to be taken at any annual or special meeting of shareholders of the Corporation may be taken without a meeting, and the power of shareholders to consent in writing, without a meeting, to the taking of any action is specifically denied.

As of June 28, 2001, Hilder lacked the power and authority to call a meeting of Optimation shareholders, in that he was not the Chairman of Optimation, the President of

Optimation or the Board of Directors. No meeting of Optimation shareholders was noticed for June 28, 2001, and plaintiffs had no notice any such meeting was to be conducted. Instead of holding an Optimation shareholder's meeting to consider the proposed Optimation/SimplyIP/Panorama Merger, Hilder prepared and signed alleged minutes and statements of shareholder actions (P Trial Ex. 59), purporting to memorialize an Optimation shareholder meeting on June 28, 2001.

Shareholder actions that Hilder and GMH Businesses Group purported to take on June 28, 2001, included the following:

    a. Approval as final the Optimation/Simply IP/Panorama Merger on the terms set forth in the Principal Points Agreement.

    b. Election of a new Optimation board of directors consisting of Hilder, McNeall and Huff.

    c. Adoption of new articles of incorporation and bylaws for Optimation.

P Trial Ex. 59.

Actions as the Optimation Board of Directors that Hilder, McNeall and Huff, purported to take on June 28, and July 1, 2001, included the following (using Corporate Resolution Nos. 00062801-A, 00062801-B, 00062801-C, 00070901-A, 00070901-B, P Trial Exs. 59, 76, 77):

    d. Involuntary "retirement" of Sadie Lundy as an employee of Optimation with a termination of her salary and benefits after ninety days.

    e. Involuntary "retirement" of Lundy as president and an employee of Optimation with a termination of his salary and benefits after ninety days.

    f. Involuntary "retirement" of S. Turner Allen.

By a letter distributed on or after June 28, 2001, McNeall and Huff directed Optimation employees to cease recognizing Sadie Lundy and Lundy as being employees of Optimation. On June 29, 2001, the Individual Plaintiffs were unaware of Hilder's alleged shareholder/board of director actions of June 28.

### Hilder Refuses to Fund 401K Contributions

Based on Hilder's representations he would be immediately funding $2 million of cash into Optimation, the Optimation BOD voted to pay first from the funds to be invested certain amounts of money owed by Optimation to an employee benefit plan known as the "401k Plan." On June 29, 2001, McNeall announced to all employees present in a company meeting that as COO of Optimation he had prepared and forwarded to the 401k Plan administrator a check in the amount of $72,590.69 to fund the 401k Plan ("the 401k Check"). The 401k Check is marked as P Trial Ex. 64. McNeall as Optimation's COO prepared and signed the 401k Check to be drawn on a new bank account McNeall and Hilder had established for Optimation to hold investment funds promised by Hilder from GMH Businesses Group.

On June 29, Lundy and McNeall sent the 401k Check and an explanatory spreadsheet to Hilder for his approval as CEO and CFO of Optimation, and for Hilder to immediately forward to the 401k Plan administrator. Hilder received the 401k Check and explanatory spreadsheet and refused to forward them to the 401k Plan administrator.

### Failure to Perform Principal Points Agreement

The business plan for the Optimation/Simply IP/Panorama Merger called for a capital investment of $5 million. During June and July Hilder repeatedly assured McNeall and Huff that he personally had investment accounts in which he held as liquid assets millions

of dollars that he could use to make the promised investment in the Optimation/SimplyIP/Panorama Merger. On July 7, 2001, Hilder represented that he was opening three new Optimation bank accounts with Wells Fargo Bank into which the funds he was investing and Optimation's revenues would be deposited. P Trial Ex. 74. By a letter dated July 9, 2001, Hilder, as President of GMH Businesses Group stated (1) a commitment to complete his investment of $1.6 million in Optimation that would be applied to obligations of Optimation according to the Principal Points Agreement, and (2) a commitment to obtain a $3.4 million line of credit for Optimation. Hilder's July 9 letter is marked as P. Trial Ex. 75. In his July 9 letter, Hilder wrote:

> As per our conversation I am very hopeful that the initial funding phase for the Optimation Simply IP merger will be complete on or before July 13, 2001. I have been working to have the funds released from the investment group since we were granted the proxy to take control of Optimation last month. I expect my attorney to clear the early release of the funds detailed in the phase # 1 below in Tuesday or Wednesday of this week. This will allow the merger to move forward and come to a successful conclusion without Optimation being closed down by its creditors.

Hilder has refused in this litigation to produce any documents indicating that there was an investment group, or to disclose the name of the alleged attorney who was working to "clear the early release of the funds."

In July 2001 after learning of Hilder's purported actions under the alleged authority of the Shareholder Proxies, Lundy and others questioned the lawfulness of Hilder's purported actions on June 28. John Granda, a partner with the Stinson Mag law firm, had been acting Optimation's corporate counsel and he wrote a detailed memorandum advising Hilder that he had lacked the power to use the Shareholder Proxies. P Trial Ex. 79. Hilder again promised to make an investment of $5 million and to complete the Optimation/SimplyIP/Panorama Merger under the Principal Points of Agreement. P Trial

Ex. 84, 85.  On the strength of those promises he solicited resignations from James H. Henson, Glen E. Henson, Lundy and Allen as the members of the Optimation BOD on July 24, 2001, and the election by the resigning Optimation BOD of McNeall, Huff and Hilder as replacement directors.  P Trial Ex. 82.  In a letter to Optimation employees dated July 24, 2001, Hilder announced that the merger of Optimation, Simply IP and Panorama!, Inc. was almost complete and would be finished within weeks.  P Trial Ex. 80.

### The Hilders' Divert Optimation Revenues

Up through July 2001, Hilder continued to direct that all incoming customer payments arriving at Optimation's offices in Independence be sent to the Hilders' home in Austin.  Huff's records of certain incoming Optimation revenues sent to the Hilders in Austin are marked as P Trial Ex. 78.  Hilder continued to suggest that he was opening bank accounts for Optimation in Austin into which he was depositing the Optimation revenues.    In this litigation, Hilder has refused to respond to discovery requesting production of records of any Optimation bank accounts, or an explanation of his use of those Optimation revenues.  P Trial Exs. 152, 177.

Prior to Hilder taking control of the day-to-day operations of Optimation in May, the corporation had entered into a factoring agreement with United Capital Funding and had secured that arrangement by granting the factor a security interest in certain accounts receivable.  Under the factoring agreement, Optimation was to direct customers of factored accounts that the customer checks were to be made payable to United Capital Funding and not to Optimation so that United Capital Funding could have some assurance that its accounts receivable were not being diverted.  By August of 2001 when

customer checks payable to United Capital Funding were showing up in Optimation's mail, Hilder was directing that the checks be deposited into Optimation's accounts or sent to his home. One of those checks (Caterpillar $71,834) is marked as <u>P Trial Ex. 89</u>. It became apparent to Huff during this period that Hilder was diverting customer payments factored to United Capital Funding. When Huff asked Hilder what he was doing with the accounts receivable proceeds that were supposed to be going to United Capital Funding, Hilder told Huff that he had talked to United Capital Funding representatives and "worked it out."

On August 29, 2001, Susan Hilder advised Huff that Hilder was in a meeting with the attorney "right now" on closing out this merger and she was putting together a proposed budget for paying off Optimation obligations. <u>P Trial Ex. 94</u>. On August 29, Hilder also sent a letter to Optimation customers describing the new management team that included Hilder as Chairman and CEO and Susan Hilder as acting Comptroller. <u>P Trial Ex. 96</u>. In that letter Hilder directed Optimation's customers not to send any more payments to United Capital Funding and to instead send all payments to the Hilders' home in Austin. <u>P Trial Ex. 96</u>. Within a month United Capital Funding would send Hilder a letter detailing some of the checks the Hilders had diverted and demanding that Hilder cease his unlawful activities. <u>P Trial Ex. 104</u>.

Hilder's diversion of incoming revenues that were property of United Capital Funding and his failure to pay this Optimation creditor as earlier agreed was symptomatic of how Hilder operated the Optimation enterprise. During trial, plaintiffs expect to offer evidence of Hilder's refusal to pay many other creditors representing obligations of hundreds of thousands of dollars. These unpaid creditors include UMB Bank, lease

finance obligations and unpaid employee expenses and vendors. It was during this late summer 2001 period that the unpaid creditors began threatening collection litigation. <u>P Trial Ex. 88</u>.

### The Sale of Optimation Assets to Optimation USA, Inc.

Sometime on or shortly after September 17, 2001, Hilder was in Austin and he prepared two Optimation, Inc. Corporate Resolutions, titled "Corporate Sales Agreement" and "Corporate Closure Agreement." Hilder telecopied the two resolutions to McNeall and Huff at the Optimation offices in Independence. <u>P Trial Exs. 98, 99</u>. Hilder called McNeall and Huff and stated that he was prepared to complete and fund the promised investment in the Optimation/SimplyIP/Panorama Merger and that he needed them as Optimation directors to sign <u>P Trial Exs.98, 99</u> and fax the two documents back to him immediately. McNeall and Huff on the strength of Hilder's representations signed the "Corporate Sales Agreement" resolution. That Resolution stated that Optimation was selling all of it assets to Optimation USA, Inc., a Texas corporation that Hilder formed and owned ("Texas OUSA"). At the time, Hilder did not give shareholders any notice of the purported sale.

The Individual Plaintiffs (who were unaware of the purported September 17 Optimation-Optimation USA sale) retained legal counsel who sent a Hilder a letter dated September 25, 2001, demanding that Hilder call an Optimation shareholders' meeting and complete the Optimation/SimplyIP/Panorama Merger. <u>P Trial Ex. 105</u>.

### October 2001 – Dispute Over Right to Remove Directors

Hilder's August 29, 2001 letter to customers advising them not to send payments to United Capital Funding was one of several events that resulted in a falling out between

Hilder and McNeall and Huff in early October 2001. McNeall and Huff were uncomfortable about the diversion of checks belonging to United Capital Funding and to others (see P Trial Ex.107), and about Hilder's failure to open corporate accounts for Optimation in Austin. Apparently, Hilder recognized that NcNeall and Huff were not going to tolerate his diversion of company assets and failure to fund the $5 million merger investment. By two documents each titled as a "Optimation, Inc. Corporate Resolution" (each numbered as Corporate Resolution Nos. 00100701-A and 00100701-A P Trial Exs. 109, 110), Hilder purported to act on his own using the Shareholder Proxies to remove McNeall and Huff as directors of Optimation.

On October 7, 2001, the Optimation articles of incorporation and bylaws (P Trial Exs. 1, 2) had not been amended by any valid shareholder action. The Optimation certificate of incorporation provided that directors could only be removed "for cause" by a shareholder vote of two thirds. P Trial Ex. 1, Art. 6, §§ 5, 6. As with other matters requiring a shareholder vote, Hilder lacked the power and authority to call a shareholders' meeting at which to address removal of McNeall and Huff. Moreover, the certificate of incorporation states:

> . . . the term 'for cause' is exclusively defined and limited to mean commission of a felony or a finding of a court of competent jurisdiction of liability for negligence or misconduct in the performance of Director's duties to the Corporation in a matter of substantial importance . . .

P Trial Ex. 1, Art. 6, §§ 5, 6. There is no evidence that a "for cause" event occurred with respect to McNeall or Huff.

In an October 25, 2001 letter to Optimation shareholders, Hilder announced he had "cancelled" the Optimation/SimplyIP/Panorama Merger and removed McNeall and Huff as officers and directors of Optimation. P Trial Ex. 114.

In October 2001, McNeall and Huff noticed and called an October 31 meeting of the Optimation board of directors at which the two of them voted to remove Hilder as CEO, CFO, President, and from all other offices with Optimation, and to remove Susan Hilder from all offices also. The notice and board of director resolution are marked as P Trial Ex. 119.

**Hilder Purports to "Cancel" Merger and "Sell" Optimation Assets**

In a November 7, 2001 letter to Optimation shareholders, Hilder announced that the company's board of directors (which Hilder contends consisted only of himself) had exercised voting power to sell the assets of Optimation to Texas OUSA, as a subsidiary of GMH Businesses Group. P Trial Ex. 121.

Hilder is the incorporator, and was in November 2001 the principal shareholder of Texas OUSA. On behalf of both Optimation and Texas OUSA, Hilder purported to negotiate and approve a written agreement providing for the alleged sale of the assets of Optimation to Texas OUSA, with a limited assumption of Optimation liabilities (the "Optimation Conveyance Agreement").

In the November 7, 2001 letter to shareholders, Hilder represented to Optimation shareholders that the Optimation Conveyance Agreement provided:

g. For the sale of the Optimation assets to Texas OUSA, with payment by Texas OUSA to Optimation for its assets to consist of (i) stock in Texas OUSA, (ii) an assumption of "a few select liabilities," and (iii) promises

that Texas OUSA would pay Optimation a percentage of its sales revenues

from the use of Optimation assets; and

h.   Texas OUSA would administer the post-sale business affairs of
Optimation in return for Optimation's payment of administration fees to
Texas OUSA.

P Trial Ex. 121.

In November 2001, Lundy through legal counsel made another demand on Hilder

to conduct a 2001 annual shareholder's meeting.  P Trial Ex. 125.  Hilder refused to call

that meeting.

### Hilder's 2002 Representations to This Court and His Attempt to Manipulate Shareholder's Meetings to Deny Shareholder Rights to the Individual Plaintiffs

In September 2002 Hilder represented in a filing in this civil action (Doc. No. 23) that

he would call an annual Optimation shareholder's meeting on Tuesday, November 5,

2002, at 1:00 p.m. at the Optimation offices in Independence, Missouri, "for the purpose

of electing the Board of Directors for the company."  P Trial Ex. 154.

Contrary to his representations to this Court in Doc. No. 23, on October 11, 2002,

Hilder sent to certain Optimation shareholders a notice of a special shareholder's meeting

to be held on October 21, 2002, at the Optimation offices in Independence, Missouri.  P

Trial Ex. 155.  That notice did not provide for the election of directors.  P Trial Ex. 155.

In the notice Hilder proposed to ask the Optimation shareholders to approve a merger of

Optimation and Texas OUSA (the "Optimation-Texas OUSA Merger").  *Id.*  Under the

terms of that merger, defendant Hilder and defendant GMH Businesses LC, which do not

own stock in Optimation, would end up owning over 61% of the merged companies.  *Id.*

Under the terms of that merger employees of Optimation and Texas OUSA would receive 2.6% of the Texas OUSA stock.

Prior to the October 21 special shareholder's meeting, Lundy exercised his rights as an Optimation shareholder and demanded of Hilder an inspection of the list of shareholders' eligible to vote at that meeting. Lundy made that Optimation shareholder list inspection on October 15, 2002. When it became apparent to the Hilders that the Individual Plaintiffs (and shareholders for whom they held proxies) would be voting over 60% of the outstanding Optimation shares of stock at the October 21 meeting, which would result in a defeat of the Optimation-Texas OUSA Merger proposal and other shareholder actions against Hilder and Susan Hilder, Hilder on the night of October 21 caused to be posted a sign stating that the special shareholder's meeting Hilder had called for that date was cancelled.

On October 29, 2002, Hilder sent to certain Optimation shareholders a notice of a *2001* annual shareholder's meeting to be held on November 13, 2002, at the Optimation offices in Independence, Missouri. Hilder's intent in calling a 2001 annual shareholder's meeting in 2002, after he had refused to call an annual shareholder's meeting in 2001, was to attempt to prevent election of 5 new directors at the annual shareholder's meeting in 2002. Prior to the November 13 annual shareholder's meeting that Hilder called, Lundy exercised his rights as an Optimation shareholder and demanded of Hilder an inspection of the list of shareholders' eligible to vote at that meeting. Lundy made that inspection on November 8 (the same list was produced on October 15).

When it became apparent that the Individual Plaintiffs would be voting over 60% of the outstanding Optimation shares of stock at the November 13 annual meeting, which

would result in election of new board of directors and other shareholder actions against Hilder and Susan Hilder, Susan Hilder distributed a "Notice of Deferral" stating that the annual shareholder's meeting called for November 13 in Independence would be "rescheduled."

### Unauthorized and Deceptive Purported Sale of Stock In Optimation

At some time during October or November 2002, Hilder and Susan Hilder apparently made certain representations to Houston A. Lundy about their authority to sell Houston A. Lundy a significant amount of stock in Optimation. Those representations by Hilder and Susan Hilder included representations to the purchaser about their authority as officers or directors of Optimation, and/or representations that the sale of Optimation stock by Hilder and Susan Hilder through their relationships to the corporation would be authorized and lawful, and that sale of the Optimation stock would allow Hilder and Susan Hilder to consummate the Optimation-Texas OUSA Merger. In connection with the purported sale of Optimation stock, Hilder also made certain misleading statements about his ability as a controlling person over Optimation and Texas OUSA to not pay certain creditors of Optimation.

At no time did Hilder or Susan Hilder seek authority from the true board of directors of Optimation (in October and November 2002, consisting of Huff, McNeall and Hilder), or from the shareholders (as required by the Restated Articles of Incorporation), regarding the sale of stock in Optimation to Houston A. Lundy. Further, Hilder and Susan Hilder concealed from the other two incumbent directors (McNeall and Huff), and the Optimation shareholders and creditors, the purported sale of the Optimation stock to

Houston A. Lundy so that Hilder could attempt to manipulate unlawfully shareholder voting.

### Hilder's Unlawful Efforts to Obtain an Optimation-Texas OUSA Merger

On November 7, 2002, Hilder caused to be filed with the Oklahoma Secretary of State a document purporting to give notice of a merger of Optimation and Texas OUSA. On November 12, 2002, Hilder caused to be distributed to certain shareholders a notice of the rescheduling of the special shareholder's meeting (originally called for October 21, 2002) to be held on November 18, 2002, in Austin, Texas. Hilder intentionally delayed the distribution of that notice to the Individual Plaintiffs. That notice stated that at the meeting Optimation shareholders would be asked to vote to approve a merger of Optimation and Texas OUSA (the Optimation-Texas OUSA Merger") that would effect the Optimation Conveyance Agreement described above.

If Hilder attempted to convene a special shareholder's meeting for Optimation shareholders on November 18, 2002, he did so on 6 days notice in that notices were not mailed to the Individual Plaintiffs until November 12, 2002. Any Optimation special shareholder's meeting convened on November 18, 2002, was without lawful notice and with a quorum of the shareholders (in that the Individual Plaintiffs who were voting over 60% of the Optimation stock were not present at the meeting).

### Optimation Shareholders Conduct an
### Annual Meeting, Vote New Directors and Oust Hilder

Huff and McNeall, as two of three directors of Optimation, called a meeting of the Board of Directors of Optimation on November 16, 2002. Hilder was given lawful notice of the meeting, but failed to attend. In response to Hilder's refusal to call an annual shareholder's meeting at which new directors could be elected, the Board of Directors at

that meeting called an annual shareholder's meeting to be held on December 2, 2002. That meeting was duly and lawfully noticed.

On December 2, 2002, an annual meeting of Optimation shareholders was convened. Over 63% of the authorized and outstanding stock was represented and voted at that meeting. Those shareholders voted to elect James H. Henson, Glen E. Henson, Richard D. Hughes, Clifton S. McArthur and S. Turner Allen as the directors of Optimation. The shareholders also adopted a resolution directing the new board of directors to commence an action on behalf of Optimation against the Hilders and their entities.

The Optimation board of directors elected at the December 2 annual shareholder's meeting subsequently convened a board meeting and directors passed a resolution to commence a civil action against Hilder, Susan Hilder and their companies. Optimation joins as a plaintiff in this action under the authority of the shareholder and director resolutions.

## II. LAW OF THE CASE

**A.** **Count A - Declaratory Relief for Avoidance of Unauthorized Corporate Transactions**

### 1. Choice of Law – Internal Affairs Doctrine

Plaintiff Optimation, Inc. was originally chartered, and up through 2002 maintained registration of that charter through the Oklahoma Secretary of State. For years, Optimation conducted most of its business in Independence, Missouri, and until the events in issue, maintained its core business operations there. The wrongs alleged in Counts A and I of the **Amended Complaint for Declaratory Relief, an Accounting, Injunction and Damages** (Doc. No. 46) are wrongs that include (1) an officer and director failing to follow Oklahoma statutes, and corporate articles of incorporation and

bylaws adopted thereunder, and (2) the diversion of assets of the corporation to his own personal use.  Hilder resides in Austin, Texas, and in 2001 moved certain of the management functions of Optimation to Texas.

Courts hearing state law claims apply the conflicts of law principles of the state in which the court sits.  *Birdsell v. Holiday Inns*, 852 F.2d 1078, 1079 (8th Cir. 1988); *Reis v. Peabody Coal Co.*, 997 S.W.2d 49, 58 (Mo.App. 1999).  Of state laws that might be considered – Missouri and Oklahoma are the most obvious.  In deciding which state's laws will apply, the initial issue is determining where a cause of action accrued. *Thompson v. Crawford*, 833 S.W.2d 868, 871 (Mo. 1992) (rights and liabilities of parties in tort to be determined by law of state with most significant relationship to occurrence and parties, citing to Restatement (Second) of Conflict of Laws § 145).

Generally, factors such as the place where the wrongful conduct occurred, the place where the injury occurred, and the place of business have a significant bearing on the determination of where the cause of action accrues.  *Thompson v. Crawford*, 833 S.W.2d at 870.  The more specific conflicts rule for wrongs of directors and officers and corporate governance disputes, is the "internal affairs doctrine."  Restatement (Second) of Conflict of Laws § 309 states:

> The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.

Courts applying § 309 have made their findings as to the place of accrual of corporate governance disputes using primarily two factors - - (1) any connection between the place where the corporation is doing business and the wrongful acts and the impact of those

acts, and (2) the lesser significance of the place of business and the wrongful acts and the impact of those acts such that the place of incorporation has appeal as the source of law because of concerns for uniformity. *Great Rivers Cooperative of Southeastern Iowa v. Farmland Industries, Inc.*, 934 F.Supp. 302, 304 (S.D. Iowa 1996) (on breach of fiduciary duties claim against Ds & Os, applying § 302 and considering Missouri statutes and limitational rules); *Ranch Hand Foods, Inc. v. Polar Pack Foods, Inc.*, 690 S.W.2d 437, 444 (Mo.App. 1985). *See also Atherton v. FDIC*, 519 U.S. 213, 224, 117 S.Ct. 666 (1997). In the case at bar, the acts challenged as wrongful to the corporation originated in activity in Missouri, however, the wrongs are in significant part violations of the Oklahoma corporate statutes and the Optimation corporate governance documents adopted pursuant to Oklahoma statutes. *See National Union Fire Ins. Co. v. Emhart Corp.*, 11 F.3d 1524, 1528 (10th Cir. 1993) (incorporation state's law applied in dispute over D & O rights originating in corporate statutes). As such, Oklahoma law should be applied to the request for declaratory relief in Counts A and I.

In *International Brotherhood of Teamsters General Fund v. Fleming Companies, Inc.*, 1999 OK 3, 975 P.2d 907, 910 (1999), the Oklahoma Supreme Court recognized the "substantial similarity" of Oklahoma and Delaware corporate statutes and the use of Delaware case law to interpret the Oklahoma statutes. Delaware case law is cited where it will be helpful to interpret the Oklahoma statutes at issue in this case.

### 2. Use of declaratory judgment to establish lack of corporate authority.

Count A of the Amended Complaint (Doc. No. 46), states an action by individual shareholder-creditors for declarations of lack of the defendants' power and authority to take certain actions on behalf of the Oklahoma corporation known as Optimation, Inc.

**a.** **Standing.** The Individual Plaintiffs have standing to bring Count A: (i) as the proxy-giving principals (as shareholders of Optimation) in the principal-agent relationship that arose with Hilder because of the Shareholder Proxies they gave to Hilder, and (ii) as shareholders and creditors to Optimation.

The remedies of a principal whose agent has violated his duties include the right to seek a declaration of those rights and an injunction against the violations. § 399(f) Restatement (Second) of Agency. *See Maritrans v. Pepper, Hamilton & Scheetz,* 602 A.2d 1277, 1284 (Pa. 1992) (injunctive relief against lawyer-agent breaching duties of loyalty). The shareholder wronged by a proxyholder acting for the proxy holder's own aggrandizement in violation of the duty of loyalty owed under the proxy has the right to a declaration of the unlawful act and an order voiding the act. 5 W. Fletcher, Cyclopedia of Private Corporations, § 2060, p. 297 (Perm Ed. 2003 Rev. Vol.), citing to *Blair v. F.H. Smith Co.*, 18 Del Ch. 150, 156 A. 207, 210-11 (1931); 58 A.L.R.2d 784 (1958)

The standing of the Individual Plaintiffs as shareholders of Optimation to bring this claim for relief is found in part in Okla. Stat. Ann. § 18-1018(1). *Total Access, Inc. v. Caddo Electric Cooperative*, 2000 OK CIV APP 60, 9 P.3d 95, 96 (Okla. Civ.App.Div. 3 2000) (discussing standing under § 18-1018 to seek avoidance of unauthorized corporate acts). Section 18-1018, however, is not the sole basis for standing in the Individual Shareholders. The purported merger of Optimation and Texas OUSA would put the majority ownership of the surviving corporation (Texas OUSA) in Hilder and reduce the percentage of stock the Individual Plaintiffs own in Optimation from 32% to less than half of that. Under *Place v. P.M. Place Stores Co.*, 950 S.W.2d

862, 865 (Mo.App.W.D. 1997), the change in corporate control to Hilder effected by the purported Optimation-Texas OUSA Merger in which Hilder has the majority of Texas OUSA stock gives the Individual Plaintiffs standing to bring this claim. Further, the Individual Plaintiffs are also creditors of the Optimation owed hundreds of thousands of dollars, and as creditors of an insolvent corporation they have a distinct standing to bring this action where the defendants are taking unauthorized actions for the purpose of attempting to hinder, delay, defeat or defraud Indivudual Plaintiffs as creditors of the corporation. § 428.024, RSMo.; *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 124 F. 3d 252 (1st Cir. 1997) (creditor brings fraudulent conveyance action to avoid "strip out" activities formatted as corporate asset sale).

**b. Declaratory judgment of avoidance.** The Individual Plaintiffs seek to establish the right to a declaratory judgment interpreting and applying Oklahoma corporate statutes, and Optimation articles of incorporation and bylaws, for declarations of (1) the invalidity of acts by Hilder to effect or cancel mergers or asset sales under the Proxies, and (2) Hilder's lack of present authority to act as if a sale of Optimation assets, or merger of Optimation and Optimation USA, Inc. has occurred. *See Moore Corp., Ltd. v. Wallace Computer Services, Inc.*, 898 F.Supp. 1089, 1094-95 (D. Del. 1995) (use of declaratory judgment in corporate governance dispute); *Place v. P.M. Place Stores Co.*, 950 S.W.2d 862 (Mo.App.W.D. 1997) (declaratory judgment action used to resolve corporate governance dispute over shareholder meeting and directorial action). If plaintiffs establish the right to the requested declarations voiding certain purported corporate actions[1], under 28 U.S.C. § 2202 plaintiff Optimation is also seeking a further

---

[1] *Moore Business Forms, Inc. v. Cordant Holdings Corp.*, 1998 Del.Ch. LEXIS 25 (Del.Ch. 4 Feb 98) is an example of how corporate governance disputes can result in civil actions in which the parties seek (1)

hearing for "all proper relief," that may include: (a) an accounting from Hilder for unauthorized use and disposition of the assets of the corporation, (b) imposition of a constructive trust, and (c) awards of monetary relief. *See Gant v. Grand Lodge of Texas*, 12 F.3d 998, 1003 (10th Cir. 1993) (recognizing broad powers of court under § 2202 to fashion equitable relief in declaratory judgment action); *Edward B. Marks Music Corp. v. Charles K. Harris Music Publishing Corp.*, 255 F.2d 518, 522 (2d Cir. 1958) (order for accounting is proper relief under § 2202).

Declaratory relief permits an early adjudication of rights and legal remedies involved in a dispute, regardless of whether claims of damages or injunctive relief have arisen or would otherwise need to be tried in the future. 12 Moore's Federal Practice § 57.04[3]. In this case because of the unresolved disputes over Hilder's power and authority to sell the assets or merge Optimation, Hilder continues to divert corporate assets to his personal use, ignores shareholder rights and continues to act to hinder, delay and defeat Optimation creditors. A prompt declaration as to Hilder's lack of power and authority to sell corporate assets or merge Optimation into a corporation Hilder owns and controls will help to reduce ongoing damages to the Optimation enterprise. *See Koch Engineering Co., Inc. v. Monsanto Co.*, 621 F.Supp. 1204, 1206 (E.D. Mo. 1985) (declaratory judgment intended to provide remedy which would minimize danger of avoidable loss and unnecesary accrual of damages).

**3.      Burden of Proof.**

At issue in Count A are Hilder's acts in different capacities, to include:

---

declarations of lack of authority and the avoidance of the unauthorized corporate actions, and (2) separate relief under contract or tort law for the unauthorized acts. See the discussion of Counts G and I with respect to claims for breaches of fiduciary duties.

(1) Hilder purporting to vote the Shareholders Proxies in the role of agent to those Optimation shareholders;

(2) Hilder as the principal of GMH Businesses who promised to provide a capital investment/ loan of $5 million in Optimation as a part of the Optimation/SimplyIP/Panorama Merger;

(3) Hilder acting as a director and officer of Optimation purportedly calling shareholder and Board of Director meetings to create a forum to approve, and then purportedly engaging in transactions in the name of the corporation - - the Optimation/SimplyIP/Panorama Merger, a sale of all Optimation assets to Texas OUSA, a merger of Optimation and Texas OUSA;

(4) Hilder as the CEO and CFO of one of the Optimation/SimplyIP/Panorama merger partners - - Simply IP;

(5) Hilder as the incorporator, majority shareholder and principal actor on behalf of Texas OUSA.

In the absence of any self-interest, as an agent of the shareholders who gave proxies, Hilder has the burden of demonstrating his full and complete disclosure[2] of the actions he was taking and his fidelity to the instructions of the principals he was serving. 3 C.J.S., Agency § 534. *See Robbins v. Roumel*, 138 A.2d 922, 924 (Mun. Ct. App. D.C. 1958) (where principal makes prima facie case by proving agency relationship and instructions, agent has burden of showing compliance with instructions). This is **not**, however, a case in which there is an absence of self-interest by the challenged agent. Every action by Hilder that is challenged is an act in which he had substantial self-

---

[2] *Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. Supr. 1994) (a fiduciary disclosure obligation attaches to proxy activities - - omissions); *Stroud v. Grace*, 606 A.2d 75, 86-87 (Del Supr. 1992) (fiduciary disclosure obligations related to proxy activities).

interest and was self-dealing[3].  An agent who is self dealing has a heightened burden to demonstrate full disclosure, due care and obedience to the principal.  *E.g., Arst v. Stifel, Nicolaus & Co., Inc.*, 86 F.3d 973, 978-79 (10th Cir. 1996) (discussing §§ 389, 390 Res. (Second) of Agency).

With respect to his acts as an officer or director of Optimation, Hilder has the burden of persuasion to prove his good faith and the intrinsic fairness to the creditors of the corporation in the transactions he purported to approve and implement for the insolvent corporation.  This requirement arises from two rules.  One, as the Delaware Supreme Court described the burden of proof for interested directors in a non-insolvency context, the interested directors to a challenged transaction "have assumed the burden of clearly proving their utmost good faith and most scrupulous fairness of the bargain." *Gottlieb v. Heyden Chemical Corp.*, 33 Del. Ch. 177, 91 A.2d 57, 58 (Del. Supr. 1952); *Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 599, 41 S.Ct. 209, 212 (1921) (plaintiffs seeking to avoid transaction between two corporations with common director, director must show entire fairness and full adequacy of consideration).  Two, outside of insolvency directors stand in a fiduciary relationship not only to the stockholders, but also to the corporation on whose board they serve.  *Malone v. Brincat*, 722 A.2d 5, 10 (Del. Supr. 1998).  At the point of insolvency the duties of the directors shift to the entire community of interests in the corporation, which adds an accountability to the creditors of the corporation who then have the priority rights against the assets of the corporation.

---

[3] The term "self dealing" describes the situation when a corporate fiduciary is on both sides of a transaction. *Sinclair Oil Corp. v. Levien.*, 280 A.2d 717, 710 (Del. Supr. 1971). For example, on one side Hilder who made the promise he would invest over $4.4 million in Optimation after the Merger, and on the other side Hilder purportedly making decisons using the Shareholder Proxies as an officer/director to deviate from enforcing the $4.4 million promise of investment and following the Principal Points of Agreement. For example, on one side Hilder deciding an an officer'director of Optimation to sell all of its assets/ merge into Optimation USA, Inc., and on the other side Hilder bargaining for Optimation USA, Inc. to take all of the Optimaiotn assets.

*Pepper v. Litton*, 308 S.Ct. 295, 307, 60 S.Ct. 238, 245; G. Varallo & D. Dreisbach, Fundamentals of Corporate Governance pp. 117-22 (ABA 1996) (Corporate Governance of the "Troubled" Company).

**4.     Specific Declarations of Hilder's Unauthorized Acts.**

Hilder (1) purported to adopt a June 28, 2001 Optimation shareholder "consent" approving the Optimation/SimplyIP/Panorama Merger, (2) purported to pass a September 17, 2001 resolution of the Optimation board of directors to sell all of the Optimation assets to Texas OUSA, and (3) purported to merge Optimation and Texas OUSA in November 2002, Hilder.

Count A for declaratory relief voiding unauthorized corporate acts, starts the resolution of this case by challenging Hilder's corporate power and authority to allegedly engage in mergers and asset sales. Here the plaintiff corporation seeks declarations in the first instance of Hilder's lack of any lawful power, while serving as an agent of the shareholders who gave the Proxies and as an officer and director of Optimation, to violate the Oklahoma corporate statutes and Optimation corporate governance documents by purporting to conduct unlawful shareholder meetings, mergers, and sales of substantially all of the assets of the corporation.

Corporate law imposes a duty of obedience on the directors and officers:

**§ 5.1 Unauthorized Acts: Statutes Controlling Directors and Officers**

> Corporate directors and officers are expected to perform their duties in accordance with applicable statutes and the terms of their corporate charters. . .
>
> . . .
>
> Corporate directors and officers are governed by numerous statutes that command corporations to carry out specified duties and impose the actual performance of such duties upon the persons through whom the corporation acts.

W. Knepper & D. Bailey, Liability of Corporate Officers and Directors, § 5-1, pp. 169, 170 (6th ed.); *International Brotherhood of Teamsters General Fund v. Fleming Companies, Inc.*, 1999 OK 3, 975 P.2d 907, 911 (1999) (statutes and corporate governance documents restrict authority of directors); *East Central Oklahoma Electric Cooperative, Inc. v. Oklahoma Gas & Electric Co.*, 505 P.2d 1324, 1327-28 (Okla. 1973) (statutes and corporate governance documents restrict authority of officers).

Acts of officers and directors in the name of the corporation that are in violation of corporate statutes, articles of incorporation, bylaws and other specific limitations on their authority are void or voidable. *International Brotherhood of Teamsters General Fund*, 975 P.2d at 911; W. Fletcher, Cyclopedia of Private Corporations, § 1997, p. 15 (1994) ("All action taken at a special meeting not properly called is a nullity."). For examples of cases in which unauthorized actions in the name of corporations have been voided see *In re Branding Iron Motel, Inc.*, 798 F.2d 396, 401 (10th Cir. 1986) (improperly authorized mortgage avoided); *In re Sunrise Island, Ltd.*, 203 B.R. 171 175-76 (Bankr. N.D. Okla. 1996) (improperly authorized loan transaction avoided); *Pennwalt Corp. v. Centaur Partners*, 710 F. Supp. 111 (E.D. Pa. 1989) (merger actions at improperly called special shareholders' meeting avoided); *Michigan Wolverine Student Co-operative, Inc. v. Goodyear & Co.*, 314 Mich. 590, 22 N.W.2d 884, 890 (1946) (transfer of all of assets of corporation on board of director action voided when not submitted for statutory shareholder approval); *Place v. P.M. Place Stores Co.*, 950 S.W.2d 862 (Mo.App.W.D. 1997) (shareholders' meeting without quorum, stock transfer purportedly approved by board of directors voided).

**(a)      Plaintiffs request a declaration that Hilder was without corporate or shareholder power or authority when he prepared and signed a document called "Optimation, Inc. Shareholder Vote Record" asserting that a "special meeting of the shareholders of Optimation, Inc. was held by Irrevocable Proxy" on June 28, 2001, and that Hilder had thereby used the Proxies and "voted to accept the final merger of Optimation, Inc. and SimplyIP following the guidelines set forth in the Principal Points of Agreement."**

*Facts material to this declaration:* Hilder solicited and obtained the Proxies of approximately 96% the Optimation shareholders, authorizing him "to vote in **a special meeting of the stockholders of Optimation** concerning the acceptance of the final Merger Agreement between Optimation and Simply IP detailing and following the guidelines set forth in the Principal Points of Agreement."  Hilder did not own stock in Optimation.  No Optimation special shareholders' meeting was called by the President (Lundy), the Chairman of the Board (Allen), or by resolution of the Optimation BOD so Hilder could attend such a meeting and use the Proxies as an agent of proxying shareholders to vote for the Optimation/SimplyIP/Panorama Merger.  No notice of any annual or special meeting of Optimation shareholders was prepared or distributed at any time in 2001.   Hilder prepared and signed a document called "Optimation, Inc. Shareholder Vote Record" stating that a "special meeting of the shareholders of Optimation, Inc. was held by Irrevocable Proxy" on June 28, 2001, and that Hilder used the Proxies and "voted to accept the final merger of Optimation, Inc. and SimplyIP following the guidelines set forth in the Principal Points of Agreement."  The Optimation certificate of incorporation provided: no action required or permitted to be taken at any annual or special meeting of shareholders of the Corporation may be taken without a meeting, and the power of shareholders to consent in writing, without a meeting, to the taking of any action is specifically denied.

33

*Legal analysis:* Shareholders control the business affairs of the corporation. *Sutter v. Sutter Ranching Corp.*, 2000 OK 84, 14 P.2d 58, 62 (Okla. 2000). As the holder of the Proxies, Hilder was an agent to those Optimation shareholders and was charged with exercising his agency without exceeding or extending the authority thereunder. *Old American Life Ins. Co. v. Biggers*, 172 F.2d 495, 499 (10th Cir. 1949) (proxy holder as agent-fiduciary); 5 W. Fletcher, Cyclopedia of Private Corporations, § 2060, pp. 296-97, 302 (all cites are to Perm Ed. 2003 Rev. Vol.) (limited and specific proxy cannot be exceeded or extended). A proxy does not authorize the agent-proxy holder to act in other capacities to the corporation. 5 Cyclopedia of Private Corporations, § 2060, p. 302. The granting of a proxy does not in itself constitute the casting of a ballot until the actual vote is taken. 5 Cyclopedia of Private Corporations, § 2060, p. 296. Leaving aside whether Hilder was attempting to exceed his authority by pursuing a merger without a final merger document[4], the point in this motion is that as a matter of uncontroverted fact the Proxies did not state any corporate power in Hilder to call a special shareholder's meeting and no meeting was called. 5 Cyclopedia of Private Corporations, § 2060, p. 300 ("a proxy authorizing a holder thereof to vote stock 'as my proxy at any election' does not give the proxy the power to call a special meeting").

The power to call a special shareholders' meeting is set out in § 6 of the Optimation Bylaws. Under Oklahoma corporate statutes, that provision controls the calling of special shareholder meetings. Okla. Stat. Ann. § 18-1056(D). In the Bylaws, the power to a call a special shareholders' meeting was restricted to the President,

---

[4] *Cf.* Okla. Stat. Ann. § 18-1082 titled "Merger or consolidation of domestic and foreign corporations," is addressed to this type of merger. The statute requires preparation of a written agreement of merger stating essential terms of the merger, such as the manner of converting the stock of each corporation. Okla. Stat. Ann. § 18-1082(B).

Chairman of Board and Optimation BOD.  In working with Hilder to prepare the form of the Proxy, Lundy and Allen had determined to hold for themselves and the Optimation BOD the power to call the shareholders' meeting at which the Proxies would be voted, so that Optimation's existing management and shareholders would retain control over the final merger process.  On June 28, 2001, Hilder did not hold any of these positions (President, Chairman, Board of Directors).  As such, Hilder had no power to call a special shareholders' meeting on June 28, 2001.

No special meeting of Optimation shareholders could be held without proper notice to shareholders.  Okla. Stat. Ann. §§ 18-1082(C), 1081(C) (20 days notice with copy of merger document or summary).  When the charter or bylaws of a corporation require corporate meetings to be called by a particular authority, the requirements must be strictly complied with and purported actions in violation of those requirements are invalid and a nullity.  5 W. Fletcher, Cyclopedia of Private Corporations, § 1997, pp. 17-18.

Hilder attempted to preempt the need to notice and actually hold a special shareholders' meeting to address the Optimation/SimplyIP/Panorama Merger, by signing an  "Optimation, Inc. Shareholder Vote Record" which stated that a "special meeting of the shareholders of Optimation, Inc. was held by Irrevocable Proxy."  The Oklahoma corporate statutes recognize that shareholder meetings are essential to corporate governance by allowing shareholders to adopt articles of incorporation prohibiting written consent actions in lieu of actual shareholder meetings.  Okla. Stat. Ann. §§ 18-

1073(A)[5], 18-1056(B).  Optimation had adopted such a provision in its articles.  That provision prohibited the "taking of action required or permitted to be taken at any annual or special meeting of shareholders" without a meeting, and specifically denied the power of shareholders to consent in writing, without a meeting, to the taking of any such action.  As such, Hilder could not use the June 28, 2001 "Optimation, Inc. Shareholder Vote Record" as a written consent that would preempt notice and holding of a shareholder's meeting to consider the Optimation/SimplyIP/Panorama Merger.  Optimation's legal counsel, John Granda of the Stinson Mag firm, advised Hilder that the use of the Proxies for written consent to the merger was not lawful.

For the reasons stated above, plaintiff requests a declaration that Hilder was without corporate power or authority when he prepared and signed a document called "Optimation, Inc. Shareholder Vote Record" asserting that a "special meeting of the shareholders of Optimation, Inc. was held by Irrevocable Proxy" on June 28, 2001, and that Hilder thereby used the Proxies and "voted to accept the final merger of Optimation, Inc. and SimplyIP following the guidelines set forth in the Principal Points of Agreement."  The purported June 28, 2001 shareholder proxy vote to approve the Optimation/SimplyIP/Panorama Merger should be declared void[6] by this Court.  Okla.

---

[5] Section 18-1073(A) provides:

> Except as provided in subsection B of this section *or unless otherwise provided for in the certificate of incorporation*, any action required by the provisions of Oklahoma General Corpoation Act to be taken at any annual or special shareholder meeting of shareholders of a corporation or any action which may be taken at any annual or special meeting of shareholders, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, seting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take the action at a meeting at which all of the shares entitled to vote thereon were present and voted . . . (Emphasis added.)

§ 18-1056(B) allows for restriction of  consent election of directors.

Stat. Ann. § 18-1018. *See generally Katz v. Bregman*, 431 A.2d 1274, 1276 (Del. Ch. 1981) (court will act in equity to address failure to obtain shareholder approval required by statute). See also *Place v. P.M. Place Stores Co.*, 950 S.W.2d 862 (Mo.App.W.D. 1997) (shareholders' meeting without quorum, stock transfer purportedly approved by board of directors voided) and the other avoidance cases cited above.

> **(b)    Plaintiffs request a declaration that Hilder was without corporate power or authority to sell all of the assets of Optimation by preparing and signing an "Optimation, Inc. Corporate Resolution" dated September 17, 2001, providing that Optimation was selling all of its assets to Optimation USA, Inc., a Texas corporation that Hilder formed and owned.**

*Facts material to this declaration:* Without any notice to Optimation shareholders, on September 17, 2001, Hilder prepared an "Optimation, Inc. Corporate Resolution" stating that Optimation was selling all of it assets to Optimation USA, Inc., a Texas corporation that Hilder formed and owned. That purported resolution was signed by three directors, Hilder, Mike McNeall and Dwight Huff. On September 17, 2001, the "whole Board of Directors" as defined in the Optimation articles and bylaws was to consist of 5 directors. The sale of Optimation's assets to Optimation USA, Inc., as purportedly approved with Hilder's September 17, 2001 "Optimation, Inc. Corporate Resolution," was not noticed and submitted at a shareholders' meeting for a vote of the shareholders.

*Legal analysis:* Oklahoma statutes restrict the power of directors and officers to sell all of the assets of a corporation. Okla. Stat. Ann. § 18-1092 (shareholder resolution required based on 20 day notice and duly called meeting). It is undisputed that, no notice

---

[6]  As discussed above, plaintiffs are not limiting this action to a request for avoidance of unauthorized acts. As discussed in *Thorpe by Castleman v. Cerbco, Inc.*, 676 A.2d 436, 445 (Del. Sup. 1996), there may damages for breach of fiduciary duties even when unauthorized actions resulted in no actual transactional damages, e.g., disgorgement of economic advantage and legal costs. The claims agaisnt defendants for monetary relief for breach of fiduciary duties are presented in Counts G and I.

was given in 2001 for a shareholders' meeting to consider any sale of all of the Optimation assets to Optimation USA, Inc. As such, there could not be any lawful approval of such a sale as required under § 18-1092. *Campbell v. Vose*, 515 F.2d 256, 259-60 (10th Cir. 1975) (under identical Delaware statute shareholder approval required). *Cf. Clarke Memorial College v. Monaghan Land Co.*, 257 A.2d 234, 241 (Del. Ch. 1969) (determining terms of sale of all corporate assets cannot be delegated as a duty of board of directors).

In addition in September 2001, the Optimation articles of incorporation also restricted the power of the Optimation directors and officers to sell all of the assets of the corporation. The Optimation articles defined this sale of all of the assets of the corporation to be a "Business Combination," and provided that if the majority of the "whole Board of Directors" (3 out of the 5 directors that were to serve on the "whole Board") approved the sale, a majority of the shareholders could approve the sale at a shareholder's meeting. P Trial Ex. 1, Art. 8, Sec. 3. The Optimation articles provided that if the majority of the "whole Board" (3 members) did not approve the sale, then the sale was to be approved by two-thirds of the shareholders. P Trial Ex. 1, Art. 8, Sec. 2. In this instance, Hilder prepared and was one of three directors who signed the Optimation corporate resolution stating that the sale was approved. That purported corporate resolution does not answer the question as to how many shareholders would have been needed to vote at a duly called shareholders' meeting to approve the sale. This sale did not simply involve the sale of all of the Optimation's assets, this sale was complicated by the fact that Hilder, in the roles of CEO, CFO and a director of

Optimation, was supposedly contracting to sell the Optimation assets to a corporation that Hilder had formed and owned, Optimation USA, Inc..

Most corporate codes include a provision to protect the corporation when officers an directors are proposing corporate transactions in which thay have a self interest. 3 Cyclopedia of Private Corporations, § 915.10. Oklahoma's provision appears as Ok. Stat. § 18-1030. The approval of the Optimation board of directors of a contract for the sale of all of its assets would be by good faith authorization by the affirmative votes of a majority of the disinterested directors. As a matter of law, because of his position and ownership of Optimation USA, Inc., Hilder was not a disinterested director of Optimation and could not vote as a member of the Optimation board to approve a sale to Optimation USA, Inc. *Michelson v. Duncan*, 407 A.2d 211, 218-19 (Del. Supr. 1979) (valid shareholder approval of interested party transaction can only occur with fair and adequate disclosure to shareholders). As noted in footnote 3 above, this was beyond self-interest, this was **self-dealing** as Hilder purported to negotiate (without any genuine participation by the other two members of the Optimation Board of Directors – McNeall and Huff) for Optimation to "sell" all of its assets to Hilder's newly formed corporation, Optimation USA, Inc.

Because there was no notice to shareholders of a shareholders' meeting to consider a sale of all of the assets, no shareholders' meeting to consider the sale, and no board of director resolution by 3 disinterested directors considering the sale, plaintiff requests a declaration that Hilder was without corporate power or authority to proceed with a sale of all of Optimation's assets to Optimation USA, Inc. when he prepared and signed an "Optimation, Inc. Corporate Resolution" dated September 17, 2001, providing

that Optimation was selling all of it assets to Optimation USA, Inc. *Robert A. Wachsler, Inc. v. Florafax International, Inc.*, 778 F.2d 547, 551-53 (10th Cir. 1985) (majority of shareholders had no knowledge of material facts sufficient to ratify interested party contract and contract remained voidable). The purported sale of Optimation assets to Texas OUSA pursuant to the September 17, 2001 resolution should be declared void by this Court. Okla. Stat. Ann. § 18-1018; *Robert A. Wachsler, Inc. v. Florafax International, Inc., supra.*; *Michigan Wolverine Student Co-operative, Inc. v. Goodyear & Co.*, 314 Mich. 590, 22 N.W.2d 884, 890 (1946) (transfer of all of assets of corporation on board of director action voided when not submitted for statutory shareholder approval).

**(c)     Plaintiffs request a declaration that Hilder was without corporate power or authority to "cancel" any Optimation/SimplyIP/Panorama Merger.**

*Facts material to this declaration:* See the facts set forth for Delaration (a) above. In addition, in a letter to Optimation shareholders dated October 25, 2001, Hilder announced that he had "cancelled" the Optimation/SimplyIP/Panorama Merger. No notice to shareholders of any annual or special meeting of Optimation shareholders was prepared or distributed at any time in 2001. At no time during the time between July 2001 and December 2, 2002, did the Optimation board of directors consider or vote on the "cancellation" of the Optimation/SimplyIP/Panorama Merger.

*Legal analysis:* As discussed above, Hilder was without the shareholder or corporate power and authority to conduct a shareholder vote (via written consent) to approve the Optimation/SimplyIP/Panorama Merger. With Hilder having no shareholder or corporate power to approve the Optimation/SimplyIP/Panorama Merger, he was just as

powerless to "cancel" the merger using the Proxies. In addition, the undisputed fact is that "cancellation" was never addressed at any meeting of the board of directors during the relevant period, and that fact further establishes lack of corporate action on the matter.

Plaintiffs request a declaration that Hilder was without corporate power or authority to "cancel" any purported Optimation/SimplyIP/Panorama Merger. *See Robert A. Wachsler, Inc. v. Florafax International, Inc.*, *supra*.

> **(d)  Plaintiffs request a declaration that Hilder was without corporate power or authority in November 2002 to call a special shareholders' meeting and to effect a merger of Optimation and Optimation USA, Inc.**

*Facts material to this declaration:* Hilder was removed as an officer of Optimation at a meeting of the board of directors held by Dwight Huff and Mike McNeall on October 31, 2001. After Hilder's removal as an officer of Optimation (he had been CEO and CFO), his only posiiton until December 2, 2002, was as only one of three members of the Optimation board of directors. Hilder did not own stock in Optimation. At no time during that the period from July 2001 to December 2, 2002, did the Optimation board of directors vote on a merger between Optimation and Texas OUSA, or vote on calling a shareholders' meeting to consider either course.

*Legal analysis:* As discussed above, Hilder was not President, Chairman, or the Optimation board of directors, and as such he was without the shareholder or corporate power and authority to notice and conduct a shareholder meeting, had no power or authority to approve any merger via written consent in lieu of a shareholders' meeting, had no authority under the Proxies to vote on an Optimation-Texas OUSA merger as opposed to the Optimation/SimplyIP/Panorama Merger, and as an interested person could not be involved in negotiating and approving an Optimation-Texas OUSA merger. Facts

¶ 14.  Without the Optimation board of directors (Hilder, McNeall and Huff) acting to consider and approve a merger[7] and issuance of proper notice for a shareholder meeting[8], no lawful shareholders' meeting could have been conducted and any merger of Optimation and Texas OUSA could not have been properly approved.  *Robert A. Wachsler, Inc. v. Florafax International, Inc.*, 778 F.2d 547, 551-53 (10th Cir. 1985) (majority of shareholders had no knowledge of material facts sufficient to ratify interested party contract and contract remained voidable).

Plaintiff requests a declaration that Hilder was without corporate power or authority to call or conduct any shareholder meeting to approve a merger of Optimation and Texas OUSA.  Any purported shareholder vote in November 2002  to approve a merger of Optimation and Texas OUSA should  be declared void by this Court.  Okla. Stat. Ann. § 18-1018; *Robert A. Wachsler, Inc. v. Florafax International, Inc., supra.*  See also *Place v. P.M. Place Stores Co.*, 950 S.W.2d 862 (Mo.App.W.D. 1997) (shareholders' meeting without quorum, stock transfer purportedly approved by board of directors voided) and the other avoidance cases cited above.

### 5.    Relief requested in Count A.

Respectfully, plaintiffs Michael D. Lundy, Jayne Lundy, S. Turner Allen, and Sadie Lundy request that under Count A of the Amended Complaint the Court enter a declaratory judgment making the declarations set forth under subparagraphs lettered 4(a) to 4(d) above.  If the Court makes these declarations, plaintiffs request under 28 U.S.C. § 2202 that:

---

[7]  Okl. Stat. §§ 18-1082(C), 1081(B) (requirement for resolution of board of directors approving merger).

[8]  Okla. Stat. §§ 18-1082(C), 1081(B) (20 days notice with copy of merger document or summary).  When the charter or bylaws of a corporation require corporate meetings to be called by a particular authority, the requirements must be complied with to render the meeting legal.  Cyclopedia of Private Corporations, § 1997, p. 15.

1. The Court enter an injunction avoiding the transactions that are the subjects of subparagraphs 4(a) to 4(c) above, enjoining the defendants acting as if the avoided corporate acts had occurred, and ordering them to relinquish all indicia and claims of corporate authority, and to relinquish control, use or possession of the assets and operations of Optimation in recognition of the elction of a new board of directors a the December 2, 2002 annual sharheolders' meeting;

2. The Court enter and order fixing a time within which the defendants shall fully account to the Court and plaintiffs by written and substantiated records for their disposition of all of the revenues of Optimation since May 16, 2001 to the date of the accounting, with the delivery of all corporate records to Optimation, Inc.;

3. For an award of attorney's fees to plaintiff's counsel;

4. Other injunctive relief and declarations that plaintiffs may request after trial with respect to the unlawful acts of the defendants;

5. Other relief requested under 28 U.S.C. § 2202, other Counts of the Amended Complaint, and otherwise.

## B. Count B – Continuation Liability

To the extent this Court determines that the Optimation assets have been transferred to Texas OUSA by sale or merger consistent with provisions of Oklahoma statutes, articles of incorporation and bylaws governing proxies and shareholder meetings, the plaintiffs seek to impose continuation liability against Texas OUSA under the reasoning of *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 124 F. 3d 252 (1st Cir. 1997).

## C. Count C – Fraudulent Conveyance

To the extent this Court determines that the Optimation assets have been transferred to Texas OUSA by sale or merger consistent with provisions of Oklahoma statutes, articles of incorporation and bylaws governing proxies and shareholder meetings, the plaintiffs seek to avoid the transfers as avoidable under the provisions of the Uniform Fraudulent Transfer Act, as adopted in Missouri §§ 425.005 to .135, RSMo., and they request all relief requested in ¶ 104 of the Amended Complaint.

### D.    Count D – ERISA 401(k)

Count D of the **Amended Complaint for Declaratory Relief, an Accounting, Injunction and Other Relief** is a claim seeking relief under the Employee Retirement Income Security Program ("ERISA") because Guy and Susan Hilder, a husband and wife sometimes using as the name of their enterprise "GMH Business Group," (1) promised in early 2001 to invest $5 million in an insolvent Optimation part of which was to be used to pay over $1.3 million of creditors, (2) took control of Optimation's assets and cash management in May 2001 with Guy Hilder named as CFO, CEO and a director of the corporation, (3) reneged on making the multi-million dollar investment, (4) have refused to conduct lawful shareholder meetings at which Optimation shareholders would determine corporate transactions and vote on directors, and (5) unlawfully diverted the Optimation assets to their own uses under the pretense of an asset sale and/or merger to a shadow company (Optimation USA, Inc.) they formed to hinder, delay and defeat the creditors and shareholders of Optimation, to include refusing to use Optimation corporate assets to pay delinquent contributions to the Optimation 401k Plan.

By taking control of the Optimation enterprise these defendants became successor fiduciaries under ERISA, who were obligated under ERISA fiduciary rules to use the

Optimation assets to fund the delinquent 401k Plan contributions. The Supreme Court has stated that a person is a fiduciary with respect to an employee benefit plan, and therefore subject to ERISA fiduciary duties, to the extent that he or she exercises any discretionary authority or discretionary control respecting "management" of the plan or has any discretionary responsibility in the "administration" of the plan. *Varity Corporation v. Howe*, 516 U.S. 489, 498, 116 S.Ct. 1065, 1071 (1996). The elaboration in *Varity* of the concept of an ERISA fiduciary occurred in the context of transactions in corporate assets where the defending corporate employer and plan administrator argued that its actions while the corporation was failing financially were governed by under state employment law, but were not within fiduciary requirements under ERISA. 516 U.S. at 504-05, 116 U.S. at 1073-74. *Varity* has several similarities to the case at bar in that misrepresentation is central feature of the fiduciary wrongs alleged against these defendants under ERISA.

In *Varity*, employee beneficiaries brought a claim under ERISA for the loss of rights to participate in unfunded employee benefit plans that resulted from misrepresentations about corporate transactions designed to separate the failing part of a corporation's enterprises from other valuable enterprises that would be retained. 516 U.S. at 493-94, 116 S.Ct. at 1069. *Varity* involved misrepresentations by the corporate management, made for the purpose of deceiving plan participants while corporate management manipulated an insufficient corporate asset base with one purpose being to end corporate responsibility for employee benefit plans. *Id*. The *Varity* court discussed the dual capacity of management members who make misrepresentations with respect to

an employee benefit plan and then manipulate corporate assets to deprive beneficiaries of the plan funding:

> The District Court, however, held that when the misrepresentations regarding employee benefits were made, Varity was wearing is "fiduciary," as well as its "employer" hat. In reviewing this legal conclusion we give deference to the factual findings in the District Court, recognizing its comparative advantage in understanding this specific context in which the events of this case occurred. We believe that these factual findings (which Varity does not challenge) adequately support the District Court holding that Varity was exercising "discretionary authority" respecting the plan's "management" or "administration" when it made these misrepresentations, which legal holding we have independently reviewed.

*See also Hunter v. Caliber Systems, Inc.*, 220 F.3d 702, 718, 2000 FED App. 0263P (6th Cir.) (further discussion of employer/plan sponsors "wearing two hats," as ERISA fiduciary and as employer).

In *Varity*, it was corporate management functioning as the plan administrator **conveying information** regarding corporate transfers and future benefit plan coverage that established the offending activities as within the scope of fiduciary activities and the disclosure requirements of ERISA. 29 U.S.C. §§ 1002(21)(A), 1022, 1024(b)(1), 1025(a); *Varity Corporation v. Howe*, 516 U.S. at 502, 116 S.Ct. at 1073. *See also Krohn v. Huron Memorial Hospital*, 173 F.3d 542, 547-51 (6th Cir. 1999) (duties of disclosure also include duty not to omit information). More recently in *Harris Trust v. Salomon Smith Barney, Inc.* 530 U.S. 243, 248-49, 120 S.Ct. 2180, 2188 (2000), it was a non-fiduciary broker-dealer executing non-discretionary equity trades for designated plan fiduciaries who was found to be subject to relief under 29 U.S.C. § 1132(a)(3), based on allegations that the non-fiduciary broker-dealer *knowingly participated* in a breach of fiduciary duties. Under 29 U.S.C. § 1104(a)(1)(D), a corporate officer or director with fiscal responsibility within the "employer" has ERISA fiduciary duties with respect to

collecting and forwarding contributions. *Monson v. Century Manufacturing Co*, 739 F.2d 1293, 1303 (8th Cir. 1984) (fiduciary liability of controller/general manager for failure to forward contributions); 29 CFR § 2509.75-6 Question D-2 item 8.

Prior to Guy Hilder taking control of Optimation as CEO and CFO on May 16, 2001, plaintiffs Lundy and Allen had been fiduciaries of the Optimation 401k Plan. Defendant Hilder took over as Chief Executive Officer and Chief Financial Officer of Optimation on May 16, 2001, based on agreements that defendants Hilder and GMH Business Group would make an agreed $5 million capital investment necessary for Optimation's payment of creditors and success of the business plan of the Optimation/SimplyIP/Panorama Merger. Since then, defendant Susan Hilder (wife of Guy Hilder) as acting Comptroller has acted with Hilder to divert the assets of Optimation to their own use.

In June 2001, Guy Hilder caused the distribution of "Proxy Materials" to Optimation shareholders, and solicited and obtained limited shareholder proxies. Schedules of creditors to be paid with the $5 million Hilder and GMH Business Group agreed to invest in Optimation were included as a part of the "Proxy Materials," and listed the payment of $42,188.27 in earlier 401k Plan withholdings ("the pre-Takeover Withholdings") as one of the items that would be paid from the money Hilder and his companies had agreed to invest in Optimation. *See* P Trial Ex. 52, "Optimation Accounts Payable Payments Projection" (Exs. F and H) p. 2 (vendor listing as "Principal (thru 4/16)"). On June 29, 2001, the chief operating officer of Optimation prepared a check for $72,590.69 ("the 401k Check") drawn on a new bank account that Hilder had established in the name of Optimation. The 401k Check was to cover payment of (1) the pre-

Takeover Withholdings of $42,188.27 and (2) paycheck 401k withholdings after May 16 (the "post-Takeover Withholdings"). As CEO, CFO and a self-appointed director of Optimation, Hilder refused to forward the 401k Check to the 401k administrator.

Thereafter, Mr. and Mrs. Hilder refused to complete the Optimation/SimplyIP. Panorama Merger and refused to hold shareholder meetings for Optimation. In October and November of 2001, Hilder represented to shareholders of Optimation that in a transaction in which he sat on both sides of the table as the sole corporate representative for both Optimation and Texas OUSA, he allegedly sold the assets of Optimation to a corporation he and his wife formed in Texas called Optimation USA, Inc., which they used as a tool to hinder, delay and defraud creditors of Optimation while they misappropriated the assets of Optimation. Mr. Hilder and Mrs. Hilder and their companies have since May 16, 2001, been in charge of and in control of the assets of Optimation and made the decisions not pay over those 401(k) funds.

These facts are more than sufficient under 29 U.S.C. § 1132, 1104(a) and *Varity* to state a claim for relief in Count D against Mr. Hilder, Mrs. Hilder and their corporation based on this unlawful and fraudulent diversion of corporate

### 2. Alternative basis for in personam ERISA liability.

Defendants have argued that they cannot have liability under the interpretation of 29 U.S.C. § 1132(a)(3) articulated in *Harris Trust v. Salomon Smith Barney, Inc.* 530 U.S. 243, 120 S.Ct. 2180, because "this liability is predicated on the nonfiduciary acting in a manner that impacts plan assets." The Supreme Court in *Harris Trust* was not so limited as the defendants suggest in its analysis of 29 U.S.C. § 1132(a)(3):

> This language, to be sure, "does not . . . authorize "appropriate equitable relief" *at large*, but only 'appropriate equitable relief' for the purpose of redress[ing any]

violations or provisions of ERISA or an ERISA plan." [cites omitted]  But §
502(a)(3) admits of no limit (aside from the "appropriate equitable relief" caveat,
which we address *infra*) on the universe of possible defendants.  Indeed, §
502(a)(3) makes no mention at all of which parties may be proper defendants –
the focus, instead, is on redressing the "*act or practice* which violates any
provision of [ERISA Title I]."

In *Harris Trust*, the Supreme Court went on to state that restitution of property (if not

already disposed of) or disgorgement of proceeds (if already disposed of) were

appropriate equitable remedies under § 1132(a)(3).  530 U.S. at 250-51.  *See also Great-*

*West Life & Annuity Ins. Co. v. Knudson*, ___ U.S. ___, ___ S.Ct. ___ (January 8, 2002)

(further analysis of equitable relief under § 1132(a)(3)).

Officers and directors of an insolvent corporation become fiduciaries to the

creditors at the point of insolvency.  *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784,

787-88 (Del. Ch. 1992); Fletcher Cyclopedia of Corporations § 849.  The assets of an

insolvent corporation are deemed a trust fund to the creditors of the corporation that is to

be administered by the directors and officers for the benefit of the creditors.  *Willner's*

*Fuel Distributors, Inc*, 882 P.2d 399, 404-05 (Alaska 1994); 1 W. Knepper and D.

Bailey, Liability of Corporate Officers and Directors § 6-2 pp. 221-222 (5th Ed.).  An

action lies against the defendants *in personam* for the value of corporate assets not

applied to the corporate obligations of the insolvent Optimation.  <u>Rucks – Brandt</u>

<u>Construction Corp. v. Silver</u>, 151 P. 2d 399, 403 (Okla. 1944); *Pemberton v. Longmire*,

151 P.2d 410, 416 (Okla. 1944) (shareholder in control of insolvent corporation's assets

cannot pledge or use corporation's property for own uses to prejudice of corporate

creditors).

Optimation was insolvent at the time negotiations began with Hilder to invest $5

million in Optimation to pay creditors and provide working capital.  Hilder refused to

make the agreed $5 million investment, took fiduciary control of the Optimation and its assets and refused to issue the 401k Check. Hilder and his wife have since then used the Optimation assets as they have pleased, refused to hold shareholder meetings, and refused to pay the 401k liabilities and other creditors. The cases analyzing the equitable relief a court may enter under § 1132(a)(3) for violations of ERISA or an ERISA plan clearly show jurisdiction to enter orders for restitution or disgorgement, or another injunction, against the Hilders as corporate control persons.

The defendants have argued that since Lundy and Allen were ERISA fiduciaries first, as a matter of law these defendants by their later failures to act cannot be charged as ERISA fiduciaries. That is not the law.

> [A]lthough a fiduciary may not liable for acts of predecessor fiduciaries, if he knows of a breach of fiduciary responsibility committed by a predecessor fiduciary, he would be obligated to take whatever action is reasonable and appropriate under the circumstances to remedy that breach. A failure to take such action would constitute a separate breach of fiduciary responsibility by the successor.

4 RIA Pension Coordinator ¶ 55,303. The defendants succeeded to management of the Optimation assets, but they refused to pay the delinquent 401kPlan contributions. That was a separate breach of fiduciary duties for which they now have liability.

### 3.    Following the Optimation Assets.

Optimation, Inc. is the employer and plan sponsor for the 401k Plan with the obligation to fund the 401k Plan. The Hilders using their companies have used a scheme of deceit to divert the Optimation assets to their own use and have acted to deny the use of those assets to pay delinquent contributions to the 401k Plan, such that there is

standing and substantive right under 29 U.S.C. § 1132 to seek recovery against these defendants for $72,590 and other sums relating to the 401k Plan.

### A. An employer sponsoring an employee benefit plan is obligated to make the contributions due to the employee benefit plan.

Employee benefit plans are sponsored by employers or labor organizations and are the obligation of the plan sponsor. 29 U.S.C. §§ 1002(5) (definition of "employer"), 1002(16)(B) ("plan sponsor" means the employer in the case of an employee benefit plan established or maintained by a single employer). The amount of any contribution required by ERISA shall be paid by the employer responsible for contributing to or under the plan. *See* 29 U.S.C. §§ 1082(c)(11)(A) (Liability for contributions), 1145 (Delinquent contributions to multiemployer plans). It is undisputed that Optimation was in a period of financial distress in the first months of 2001 when 401k Plan contributions were not forwarded by Optimation to the plan. The action of not forwarding plan contributions was the action of the corporation - - by its representatives. The change in the Optimation management team when the Hilders took control of cash flow in May 2001 did not change who owed the duty to make 401k Plan contributions – the duty to make the 401k Plan contributions remained the duty of the corporation - - Optimation, Inc.

Optimation has never has paid over the delinquent 401k Plan contributions owed by the corporation as plan sponsor. The only defense argued by the defendants is that instead of using the assets of this insolvent corporation to pay its obligations, the plaintiffs as plan fiduciaries should instead be forced to accept as a personal obligation the corporation's obligation to make the delinquent plan contributions. These two plaintiffs, as plan fiduciaries for the Optimation 401k Plan, have standing and the

substantive right under 29 U.S.C. § 1132(a)(3)(B) to collect the delinquent plan contributions from the corporate assets. *Romney v. Lin*, 105 F.3d 807, 810 (2d Cir. 1997) (§ 1132 provides cause of action by plan fiduciaries to enforce employer contributions to ERISA plans).

> **B. The Hilders and their companies, in taking formal fiduciary positions with Optimation, in taking control of the cash flow of the insolvent corporation while promising to invest $4.4 million that would make Optimation solvent, and in serving as the entity destinations for Optimation assets, were fiduciaries to the corporate employer who were obligated to use the corporate cash to pay the 401k contributions.**

It is undisputed that while Optimation was insolvent, the Hilders took control of the Optimation revenues and have refused to pay the delinquent 401k Plan contributions. The common law of trusts offers a starting point for analyzing for duties under ERISA unless the language, structure or purpose of the statute is inconsistent with the common law. *Harris Trust v. Salomon Smith Barney, Inc.,* 530 U.S. 243, 250, 120 S.Ct. 2180, 2189 [9] (2000). An officer or director in control of the assets of an insolvent corporation holds those assets in trust for the benefit of the corporation's creditors. *Gentry v. Jeffrey*, 389 P.2d 519, 522 (Okla. 1964); G. Varallo & D. Dreisbach, Fundamentals of Corporate Governance pp. 117-20 (ABA 1996) (Duties of Directors of the "Clearly Insolvent" Corporation – The Trust Fund Doctrine). The Optimation 401k Plan was a creditor of Optimation at a time when the corporation was insolvent. The common law imposes a trust that follows the assets of the insolvent corporation. Under both the laws of corporations and ERISA, the concept of constructive trusts following wrongfully diverted assets is well recognized. As the Court stated in *Harris Trust v. Salomon Smith Barney, Inc*:

> Whenever the legal title to property obtained through means or under circumstances "which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never, perhaps, have had any legal estate therein . . ."

530 U.S. at 250-51, 120 S.Ct. at 2189. That a transferee was not the "original wrongdoer" does not insulate him from liability. 530 U.S. at 251, 120 S.Ct. at 2189-90. The constructive trust follows property. *Id.* The Hilders and their corporations are not lawful transferees and do not even hold bare legal title. Under the common law of constructive trust applied under § 1132(a), equity will follow and recover the Optimation assets for the benefit of the 401k Plan.

The Hilders, their enterprises, and transferees who take with knowledge of the Hilders' wrongs must be held accountable in equity under 29 U.S.C. § 1132(a)(3)(B) for the return of Optimation assets necessary to pay the delinquent 401k Plan contributions, interest on those contributions, and attorney's fees. *See Harris Trust v. Salomon Smith Barney, Inc.*, 530 U.S. at 251, 120 S.Ct. at 2189-90 (discussing transferee liability as recognized in the Restatement of Restitution).

### F. Count F – Constructive Trust

A constructive trust should be imposed to cover over all of the Defendants' assets until such time and on such terms as will ensure the return to Optimation all of the assets of the corporation, to include following all property originating with the corporation that has subsequently been transferred or turned in to another form. *See, e.g., Harris Trust v. Salomon Smith Barney, Inc.*, 530 U.S. at 251, 120 S.Ct. at 2189-90 (discussing constructive trust remedy and transferee liability as recognized in the Restatement of Restitution); *Irwin v. West End Development Co.*, 481 F.2d 34 (10th Cir. 1973)

(constructive trust imposed on shares officer acquired for himself in violation of articles of incorporation); *Brown v. New York Life Ins. Co.*, 58 F.Supp. 252, 255 (D. Or. 1944) (constructive trust imposed on officer/director diverting corporate assets); *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del. Ch. 1949) (constructive trust imposed for breach of fiduciary duties of loyalty to corporation).

### G.  Count G – BREACH OF FIDUCIARY DUTIES

There is a claim for constructive fraud in Hilder's failure to fulfill his representation that he would invest $5 million in Optimation.  *See White v. Mulvania*, 575 S.W.2d 184, 189 (Mo. Banc 1979) (breach of promise made during fiduciary relationship constructively fraudulent); *Schimmer v. H.W. Freeman Const. Co., Inc.*, 607 S.W.2d 767, 770 (Mo.App. E.D. 1980) (breach of promise made during fiduciary relationship constructively fraudulent).  There is also a claim for Hilder's lack of loyalty as an officer and director of the insolvent corporation.  A judgment for monetary relief should be entered against Hilder for his breach of fiduciary duties.  Hilder promised to invest $5 million in Optimation as the means for the company to pursue the business plan after the Optimation/SimplyIP Merger.   The remedy for his breach of this promise made in a fiduciary relationship is the entry of an order requiring Hilder to pay the $5 million he promised to invest.  *See White v. Mulvania*  and *Schimmer v. H.W. Freeman Const. Co., Inc.*

Alternatively, because the defendants have insisted on continuing to operate Optimation while misrepresenting their intentions and ignoring the hundreds of thousands of dollars of creditors, this is an appropriate case for the defendants to be held liable for

the deepening insolvency of Optimation, which encompasses breaches of the duties of disclosure, loyalty and due care.

### H. Count H – GUARANTOR REIMBURSEMENT, EXONERATION and SUBROGATION

Plaintiff Lundy has been subjected to certain suits as a guarantor of obligations of Optimation. To the extent Lundy's rights of reimbursement, exoneration and subrogation have not been addressed in pending cases bought by the obligees, Lundy seeks judgment to establish his rights as a guarantor called to answer for the debt of the principal obligor.

Plaintiffs request leave supplement this briefing as appropriate based on further pretrial and trial events.


_____/s/_ Thomas M. Franklin_____
THOMAS M. FRANKLIN (Mo.Bar No. 32358)
The Franklin Law Firm
300 United Missouri Bank Building
1310 Carondelet Drive
Kansas City, Missouri  64114
**(816) 942-1900** Telecopier No.:  **(816) 942-2671**

Attorney for Plaintiffs

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via the ECF email notification system on this 29th day of September, 2003, to:

Douglas D. Silvius
Spradley & Riesmeyer, PC
4700 Belleview
Kansas City, Missouri 64112

ATTORNEY FOR DEFENDANTS

_____/s/_ Thomas M. Franklin