# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| MICHAEL D. LUNDY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 02-0189-CV-W-FJG |
| ) | |
| GUY M. HILDER, et al., ) | |
| ) | |
| Defendants. ) | |

## ORDER

Before the Court are (1) the parties' respective proposed findings of fact and conclusions of law (Doc. Nos. 242, 243, and 244); and (2) Michael Lundy's Motion for Judgment as a Matter of Law on Count I of the Counterclaim (Doc. No. 236). This matter came to trial on August 29, 2005. The trial was concluded on August 30, 2005. After hearing the evidence and reviewing written submissions, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT/CONCLUSIONS OF LAW

**A.  STANDING, JURISDICTION AND VENUE**

1. Individual plaintiffs Michael D. Lundy ("Lundy"), Jayne Lundy, S. Turner Allen ("Allen"), and Sadie Lundy (the "Individual Plaintiffs"), reside in Missouri and assert claims as creditors and shareholders of the Oklahoma corporation, Optimation, Inc.

2. Plaintiff Optimation, Inc. ("Optimation") is a software development and sales enterprise conducting business in Independence, Missouri.

3. This Court has subject matter jurisdiction over the entire case under 28

U.S.C. § 1332(a)(2), in that this is a controversy between citizens of different States, with Individual Plaintiffs all citizens of Missouri, plaintiff Optimation a citizen of Oklahoma and Missouri, the defendants all citizens of Texas, and the amounts in controversy for each plaintiff exceeding $75,000 exclusive of interest and costs. Furthermore, plaintiffs have stated claims arising under federal law in Count D (a claim under 29 U.S.C. § 1132) and Count J (a claim under the Securities Exchange Act of 1934, § 10b, 15 U.S.C § 78(b)).

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

5. Defendants Guy M. Hilder ("Hilder") and Susan Hilder are individuals who reside at 6625 Hot Springs Drive, Austin, Texas 78749.

6. Defendant Optimation USA, Inc. ("Texas OUSA") is a Texas corporation with its principal business office at the Hilders' home at 6625 Hot Springs Drive in Austin, Texas 78749.

7. Defendant GMH Business, L.C. ("GMH") is a Texas limited liability company.

**B. FINDINGS OF FACT**

1. In January, 2001 Optimation Inc. ("Optimation") was an Oklahoma certificated corporation doing business in Independence, Missouri. (Amended Complaint, ¶ 8).

2. At that time, Optimation was short on cash and had insufficient operating capital to pay its current obligations as those obligations came due, such that it was "insolvent" as that term is used in Missouri statutes. (Amended Complaint, ¶ 9).

3. Before May 10, 2001 Optimation had sold off its receivables to a factoring company. Funds raised paid off certain debts, including tax liabilities for which Michael D. Lundy ("Lundy") would have otherwise been partially liable. This was the sole source of cash flow for Optimation. (Trial testimony of Lundy, August 29, 2005, Tr. at 16:14–18:8.

2

Hereinafter, all trial testimony is from August 29, 2005 and is referred to as "Tr. at ____").

4. For the years 1998, 1999 and 2000, Optimation had cumulative losses in excess of $800,000. (Tr. at 114:17-25; Plaintiffs' Ex. 3.)

5. The claims of Lundy, Sadie Lundy and S. Turner Allen as guarantors, note holders and employees set forth in paragraphs 56 – 64 of the Amended Complaint were unsecured debt and had no possibility of being paid by April 2001 from the assets of Optimation. (Tr. at 115:6–115:8).

6. During early 2001, Optimation (through Lundy and Allen) was negotiating with Mike McNeall and Dwight Huff, who acted for two corporations known as SimplyIP, Inc. and Panorama!, Inc., toward a letter of understanding known as the "Principal Points Agreement" (the "PPOA", Plaintiffs' Ex. 39), pursuant to which a final written agreement would provide for McNeall and Huff's group to bring over $4,400,000 of new capital and loans into a merged company holding enterprises and assets of three corporations, Optimation, Inc., SimplyIP, Inc. and Panorama!, Inc. (the "Optimation/SimplyIP Merger"). (Plaintiffs' Ex. 39.)

7. By May 16, 2001, directors of the three corporations, Optimation, SimplyIP, Inc. and Panorama!, Inc., had approved the Principal Points Agreement. (Plaintiffs' Exs. 35 and 39.)

8. On May 16, 2001, the duly elected members of the board of directors of Optimation were James H. Henson, Glen E. Henson, Lundy and Allen. (the "Optimation BOD"). Allen was the Chairman of the Optimation BOD. Lundy was President of Optimation. (See Tr. at 35:18–36:8; Plaintiffs' Ex. 35.)

9. McNeall and Huff, had made certain agreements with Hilder and GMH under

which Hilder and GMH would participate in the Optimation/Simply IP Merger. See, e.g., (Plaintiffs' Ex. 29.) Hilder represented to McNeall, Huff and Optimation that GMH would make a capital investment in, and loans to the post-merger Optimation of over $4.4 million. (Plaintiffs' Exs. 28 and 50.)

Hilder represented to McNeall and Huff that (i) he had more than $4.4 million of his own money in personal accounts that would be used to make the investment, (ii) he had substantial connections with banks and investment firms to eventually "take Optimation public," and (iii) he would not be obtaining the $4.4 million of investment funds from any third party. (See Ex. 28; Tr. at 29:9–30:20.)

10.  In April of 2001 agents of Optimation contacted Guy M. Hilder ("Hilder") at his offices in Austin, Texas. On May 10th, the Optimation BOD caused Hilder to be elected Chief Financial Officer of Optimation. (Tr. at 32:18–33:11.) At that time Lundy had never met Hilder or spoken with him on the telephone. (Tr. at 111:18–111:23.)

11.  Within one week, Guy Hilder was made Chief Executive Officer of Optimation. (Tr. at 111:24–112:2.)

12.  At trial, Hilder admitted that he did not have $4.4 million in accounts he held in 2001. (Tr. at 197:17–198:2.)

13.  Based on the PPOA, and relying on Hilder's representations as to investment funds, the Optimation BOD acted to facilitate a merger under the PPOA by adopting a Resolution appointing Hilder as chief executive officer (CEO) and chief financial officer (CFO) of Optimation, McNeall as its chief operating officer (COO), and expressly retaining the office of President to Michael D. Lundy until the merger was completed. (Plaintiffs' Ex. 35.)

4

14. Hilder thereafter undertook to control the enterprises and assets of Optimation and held himself out as CEO and CFO of Optimation. Hilder directed that all incoming Optimation receipts be sent to his home in Austin. (Tr. at 133:19–134:6.) Huff testified Hilder and his wife Susan began controlling Optimation's corporate finances from their home. (See Tr. at 148:22–149:22. See also Plaintiffs' Exs. 64, 66, 76.)

15. On June 7, 2001, McNeall, Hilder, and Allen caused distribution of a package of "Proxy Materials" to Optimation shareholders. (Plaintiffs' Ex. 39.) Hilder obtained shareholder proxies from most of the Optimation shareholders (the "Shareholder Proxies"). (Plaintiffs' Ex. 40.) As this Court found in its Order of August 23, 2005 (Doc. No. 233), each Shareholder Proxy gave Hilder a specific, limited authority to vote Optimation shares for acceptance of a final written merger agreement for the Optimation/SimplyIP Merger, and to take certain corporate actions contingent upon shareholder approval of the Optimation/Simply IP merger.

16. No final merger agreement for the Optimation/Simply IP Merger was prepared.

17. On June 28, 2001, Article Fifteen, Section 1 of the Optimation Restated Certificate of Incorporation provided shareholder actions could not be taken through written consents. (See Plaintiffs' Ex. 1.) Article Fifteen, Section 2 provided only the Chairman of the Optimation BOD, President of Optimation, or the Optimation BOD by resolution, had the authority to call a shareholder meeting. (See id.)

18. On June 28, 2001, Hilder was not the Chairman, President, or the Optimation BOD and he therefore had no corporate authority to call a special shareholders meeting.

(See Tr. at 45:13–46:12.)

19. On and after June 28, 2001, Hilder claimed to take certain written shareholder actions on the authority of Shareholder Proxies without notice of or holding a shareholder meeting. (See Plaintiffs' Ex. 42; Tr. at 48:20–49:19.)

20. On June 28, and July 1, 2001 Hilder, Michael McNeal and Dwight Huff acted as directors of Optimation and, among other actions, involuntarily "retired" Lundy, Sadie Lundy and S. Turner Allen as employees of Optimation. (Amended Complaint, ¶ 26; Plaintiffs' Ex. 42.)

21. The operations of Optimation in 2001 were located in Missouri. (Tr. at 115:18–115:21.)

22. Neither Lundy, Sadie Lundy nor S. Turner Allen had written employment contracts with Optimation. (Tr. at 115:24–115:25.)

23. Prior to Hilder's employment by Optimation, officers of Optimation were making deductions from Optimation employees' paychecks for contributions to a "401K Plan." These withholdings were not held in trust. (Tr. at 12:9–12:10, 18:13–19:15.)

24. On June 29, 2001 a check in the amount of $72,590.69 was forwarded to Hilder to pay said amount into the 401K Plan. (Tr. at 51:6–51:22, 118:3-119:10; Plaintiffs' Ex. 44.)

25. In the last weeks of July 2001, Hilder solicited resignations from James H. Henson, Glen E. Henson, Lundy and Allen as the members of the Optimation BOD, and the election by the resigning Optimation BOD of McNeall, Huff and Hilder as replacement directors, using oral and written representations of an intent to follow the PPOA and as to providing over $4.4 million of new capital and loans. (Plaintiffs' Ex. 57. See also Tr. at

62:17–63:8.)

26. Hilder and GMH did not make or arrange the $4.4 million in promised investment and loans.

27. In August or September of 2001, Hilder, McNeall and Huff got into a dispute over Hilder directing Optimation revenues to Austin because of United Capital Funding's (a factoring company) claims to specific receipts, and problems in Independence meeting current obligations. (Tr. at. 147:24–148:18.)

28. Hilder prepared a "Corporate Sales Agreement" dated September 17, 2001, purporting to approve the sale of all of Optimation's assets to Optimation USA, Inc., a Texas corporation. (Plaintiffs' Ex. 69.) Huff testified Hilder telecopied Exhibit 69 from Austin to Huff and McNeall in Independence and insisted they sign and return the Agreement the same day by telecopy. Huff believed they were only completing a step necessary for the Optimation/Simply IP Merger, and they had no intention of approving any sale of Optimation assets to Texas OUSA outside of an Optimation/Simply IP Merger. (See Tr. at 150:20–154:24.) The Court finds that the "Corporate Sales Agreement" between Optimation and Optimation USA, Inc. to be (1) contrary to the Principal Points of Agreement, and (2) void, in that Texas OUSA had not even been properly formed yet (see ¶ 33, below).

29. By September 25, 2001, plaintiffs had sent their first demand letter to Hilder demanding a shareholder meeting and accountability as to Hilder's compliance with the PPOA. (Plaintiffs' Ex. 73; Tr. at 66:5-66:18.)

30. Hilder admitted Huff and McNeall were never shown a purported Merger

7

Agreement between Optimation and Texas OUSA that Hilder alone signed with a date of September 28, 2001. (Tr. at 232:10–232:14, Defendants' Ex. 2.) Hilder testified he alone could sign the Merger Agreement included in Defendants' Ex. 2 for Optimation because he was CEO. (Tr. at 233:9–233:22.)

  31. Hilder testified that at the end of September 2001 he decided Simply IP and Panorama were "scam" entities. (Tr. at 208:15–208:22.) Hilder testified he visited Optimation offices in Independence at the end of September and spoke with McNeall about the dispute over incoming receipts, and by October 5 he knew he could not trust McNeall and Huff to route incoming Optimation receipts to the Hilders' home in Austin. (Tr. at 230:1–231:23, Plaintiffs' Ex. 65.) By October 5, Hilder knew he was not going to proceed with the Optimation/Simply IP merger. (See id.)

  32. The dispute over use of Optimation's receipts developed further on October 7, 2001, when Hilder purported to act alone using the Shareholder Proxies to remove McNeall and Huff as Optimation directors. (Plaintiffs' Exs. 77, 78.)

  33. On September 28, 2001, Texas OUSA had not filed Articles of Incorporation. (Tr. at 234:8–234:21.)

  34. With the Hilders as interested parties to the purported sale or merger between Optimation and OUSA and failing to give consideration for a 62% ownership interest in the Optimation enterprise (see Tr. at 86:13–86:19, Plaintiffs' Ex. 121), this Court does not find credible defendant Guy Hilder's testimony (see Tr. at 220:19–221:7) regarding Optimation/Texas OUSA merger as an innocent ministerial step toward the Optimation/Simply IP Merger.

  35. In an October 25, 2001 letter to Optimation shareholders, Hilder announced

8

he had "cancelled" the Optimation/SimplyIP Merger. (Plaintiffs' Ex. 81.)

36. McNeall and Huff noticed and called an October 31, 2001 meeting of the Optimation BOD and removed Hilder and Susan Hilder as officers of Optimation. (Plaintiffs' Ex. 84.)

37. Hilder and Susan Hilder noticed and cancelled multiple shareholder meetings during the time frame relevant to this lawsuit. (See Plaintiffs' Exs. 118, 121, 124, 125, 127, and 129.)

38. Michael Lundy is a guarantor of the Optimation obligations to UMB Bank, and three lease financing companies. (See Plaintiffs' Exs. 91, 93, 96, and 102.)

39. Because of the diversion of Optimation assets by Hilder, Susan Hilder and Texas OUSA using their control of Optimation assets and business affairs to withhold payments, creditors UMB Bank and the three lease financiers invoked the guarantees given by Lundy for Optimation. Under those guarantees, Lundy has paid money, has property at risk and has incurred and continues to incur legal fees. (Tr. at 73:23–76:15.)

40. Lundy has purchased all of the rights of UMB Bank as the secured creditor holding a promissory note for $140,000 and a security interest in Optimation's assets and has succeeded to the rights documented in Plaintiffs' Ex. 20. (See Tr. at 75:4–75:20.) Lundy acquired the rights of the secured creditor to all accounts receivable, equipment and general intangibles. By January 2002, UMB Bank had declared the loan to Optimation, with an outstanding balance of $139,776 to be in default. (Plaintiffs' Exs. 93 and 96.)

41. After taking control of the Optimation enterprise and assets, defendants reported in a bankruptcy filing that they collected revenues as follows: $396,000, in four months in 2001; $1.749 million in 2002; $1.663 million in 10 months of 2003. (See Tr.

97:4–99:3; Plaintiffs' Ex. 150 (Optimation Profit and Loss Statements)).

42.     Defendants objected to plaintiffs' discovery requests and did not provide financial and other information about the Optimation enterprise and corporate affairs. (See Exs. 114 and 144.)

**C.    CONCLUSIONS OF LAW**

COUNT A – FOR DECLARATION OF, AND INJUNCTION AGAINST VOID CORPORATE TRANSACTIONS AND ACTIONS

43. Count A under the statutory and common laws of corporations, for avoidance of all purported transactions involving mergers and Optimation assets and stock is ruled in favor of Individual Plaintiffs, who have standing as proxy givers, against Guy Hilder as proxyholder. The Court finds that plaintiffs have not stated a claim upon which relief may be granted against defendants Susan Hilder, Texas OUSA, and GMH Businesses Group.

44. Hilder as proxyholder of the Shareholder Proxies is a fiduciary to the plaintiffs. In these fiduciary roles Hilder had the burden to demonstrate the authority and intrinsic fairness of their purported transactions between Optimation and Texas OUSA. See the authorities cited at pp. 29-31 of Individual Plaintiffs' Trial Brief (Doc. No. 176). Hilder failed in that burden.

45. The purported written consents prepared by Hilder for shareholder actions and all other actions taken by Hilder to effect a merger, or transfer assets or rights in Optimation assets or stock, to include actions memorialized in Plaintiffs' Exhibits 42, 69, 77, 78, 128 and 152, are hereby declared void ab initio for lack of authority under the Shareholders Proxies.

46. Because necessary shareholder, directorial and secured creditor actions were

10

not obtained by Hilder, the Court hereby declares that all subsidiary or derivative agreements or actions taken by the Hilders in the name of Optimation are void ab initio.

COUNT B–INDIVIDUAL PLAINTIFFS FOR CONTINUATION LIABILITY

47. As the Court has found that the merger/sale of Optimation to Texas OUSA was ineffective, this claim is rendered moot.

COUNT C – INDIVIDUAL PLAINTIFFS FOR FRADULENT CONVEYANCE

48. The individual plaintiffs as creditors of Optimation have made claims against Hilder, Susan Hilder, Texas OUSA and members of GHM Businesses Group for fraudulent conveyances.

49. However, as the Court has found that the merger/sale of Optimation to Texas OUSA was ineffective, the claim against Texas OUSA is rendered moot.

50. Furthermore, as Optimation was insolvent in early 2001 and the individual plaintiffs are unsecured creditors, plaintiffs have not demonstrated that the actions of Hilder, Susan Hilder, and GMH Businesses Group have caused them any damage.

51. Therefore, Count C is **DISMISSED**.

COUNT D–INDIVIDUAL PLAINTIFFS UNDER ERISA

52. This claim is brought by plaintiffs Lundy and Allen and against defendants Hilder, Susan Hilder and GMH.

53. No evidence was presented at trial that plaintiff Allen suffered any damages. Accordingly, plaintiff Allen's claims are dismissed.

54. As plaintiff Lundy is not a current plan fiduciary, nor is the Optimation Inc. 401k Plan a party to this lawsuit, plaintiff Lundy does not appear to have standing to bring claims

11

against these defendants under ERISA.[1]

55. Furthermore, plaintiff Lundy appears to have been responsible as a former plan fiduciary for failure to submit employees' contributions to the 401k Plan.

56. Therefore, to the extent this claim is considered as a simple claim for reimbursement of Lundy as a creditor of Optimation for failure to reimburse him for fines paid by Lundy personally to the Optimation 401k Plan, Lundy's claims fail under the doctrine of unclean hands. Plaintiffs' claims in Count D of the complaint are **DISMISSED.**

COUNT E–INDIVIDUAL PLAINTIFFS FOR CONTINUATION LIABILITY ("COBRA")

57. This claim was previously dismissed by Court Order (Doc. No. 194).

COUNT F–INDIVIDUAL PLAINTIFFS FOR CONSTRUCTIVE TRUST

58. Individual plaintiffs do not raise this claim in their proposed findings of fact and conclusions of law. The Court believes that this claim would be more appropriately considered a remedy available to plaintiff Optimation Inc., and not a remedy available to the individual plaintiffs. Accordingly, Count F is **DISMISSED**.

COUNT G – INDIVIDUAL PLAINTIFFS FOR BREACH OF FIDUCIARY DUTIES

59. Count G for breach of fiduciary duties by proxy holder is ruled for plaintiffs Lundy, Sadie Lundy and Allen against defendant Hilder. The Court finds that plaintiffs have not stated a claim upon which relief may be granted against defendants Susan Hilder, Texas OUSA, and GMA Businesses Group.

60. Hilder breached fiduciary duties to his proxy givers by misusing the Shareholder

---

[1] Plaintiff Lundy does not seek reimbursement as to his personal 401k account; he only seeks reimbursement for amounts he paid into the Optimation 401k account as part of his settlement with the Department of Labor.

Proxies for his own gain and to the detriment of Individual Plaintiffs by denying shareholder rights in Optimation and unlawfully purporting to divert Optimation assets to his own benefit.

61. While Individual Plaintiffs may have suffered damages individually as a direct result of those breaches of fiduciary duties, this Court will not award damages duplicative of relief being awarded under Count I, accordingly the Court awards $1 to each Individual Plaintiff as nominal damages for Hilder's breach of fiduciary duties.

COUNT H – MICHAEL D. LUNDY FOR GUARANTOR SUBROGATION

Count H under the common and statutory laws of guaranty, subrogation and assignment is ruled for Lundy against defendants Hilder, Susan Hilder, Texas OUSA and GMH:

62. In order to settle claims asserted by UMB Bank on the guaranty of Lundy, Lundy has purchased all of the rights of UMB Bank as a secured lender to Optimation.

63. Hilder, Susan Hilder, Texas OUSA, and GMH have since September 2001 exercised dominion and control over the Optimation assets, which were the collateral securing Optimation's obligation to UMB Bank (the "Collateral").

64. These defendants interfered with rights of a secured creditor in the Collateral to which Lundy is subrogated and assigned. See Farmers State Bank v. FFP Operating Partners, 23 Kan. App. 2d 712, 715-16 (1997).

65. The evidence is that while these defendants diverted the Optimation assets to their own use no later than September 17, 2001, Lundy as subrogee of the secured creditor rights is entitled to a judgment for damages against defendants for accounts receivable they collected after UMB Bank's January 2002 default declaration. This amount will be determined by the Court following the accounting that will take place as detailed below in

13

Count I.

## COUNT I – OPTIMATION, INC. FOR BREACH OF FIDUCIARY DUTIES AND ACCOUNTING

Count I under the common and statutory laws of corporations is ruled for plaintiff Optimation, Inc. against defendants Hilder, Susan Hilder, Texas OUSA and GMH:

66. Hilder's July 2001 representations as to (i) his and/or GMH Businesses' intent to invest over $4.4 million in Optimation, and (ii) having funds ready to be invested in Optimation, were false when made to Optimation directors, were made with the intent of manipulating the existing Optimation BOD into resigning so that Hilder might take control of the corporation, and the Optimation BOD relied on those representations in resigning.

67. Hilder, as an officer and director of Optimation, and as an officer and director of Texas OUSA (which Hilder claims is the merger successor to Optimation), is a fiduciary to plaintiff Optimation. Susan Hilder, as a person aiding and abetting Hilder to breach his fiduciary duties, see Malpiede v. Townson, 780 A.2d 1075, 1097 (Del. Supr. 2001), and as an officer and director of Texas OUSA, is a fiduciary to plaintiff Optimation. In these fiduciary roles Hilder and Susan Hilder had the burden to demonstrate the authority and intrinsic fairness of their purported transactions between Optimation and Texas OUSA. See the authorities cited at pp. 29-31 of Individual Plaintiffs' Trial Brief. The Hilders failed in that burden.

68. The purported written consents prepared by Hilder for shareholder actions and all other actions that Hilder, Susan Hilder and GMH, have purportedly taken to effect a merger, or transfer assets or rights in Optimation assets or stock, including but not limited to actions memorialized in Exhibits 42, 69, 77, 78, 128 and 152, are hereby declared void

ab initio for lack of authority under the Shareholders Proxies and for failure to comply with requirements of the Optimation Restated Certificate of Incorporation and Bylaws and Oklahoma statutes.

69. Because necessary shareholder, directorial and secured creditor actions were not obtained by Hilder, Susan Hilder, Texas OUSA or GMH, the Court hereby declares all subsidiary agreements or actions taken by the Hilders in the name of Optimation are void ab initio.

70. Hilder had no authority under the Optimation Restated Certificate of Incorporation (Plaintiffs' Ex. 1) to take the action detailed in ¶ 32, above, purportedly removing Huff and McNeall as Optimation directors. On October 31, 2001, Huff and McNeall acted as the Optimation BOD to remove Hilder and Susan Hilder as officers, employees and agents Optimation, and every action by the Hilders in the name of, for or on behalf of Optimation thereafter was unauthorized and ultra vires.

71. In this case, the Hilders refused to provide financial and other information about the Optimation enterprise and corporate affairs during this period. Exhibits 114, 144.

72. Optimation is entitled to an accounting from the Hilders as to the disposition of all Optimation revenues they diverted from and after September 17, 2001. Directors and officers have liability for misappropriated funds and converted assets when they do so in violation of fiduciary duties to the corporation. Zakibe v. Ahrens & McCarron, Inc., 28 S.W.3d 373, 384-86 (Mo. App. E.D. 2000); Restatement Restitution § 138.

73. Once the accounting has been accomplished, the Court will make a determination as to whether an order of disgorgement should be entered against defendants Hilder, Susan Hilder, Texas OUSA, and GMH Businesses.

74. As further remedy for these breaches of fiduciary duties, Optimation is entitled to a constructive trust to preserve the Optimation assets and the proceeds of those assets, which constructive trust shall encompass and follow that property into any identifiable forms of property under the control of entities controlled by the Hilders and to any third parties who are not good faith transferees for value given to Optimation.

75. An injunction shall be entered against Hilder, Susan Hilder, and their entities and agents barring them from (i) claiming or acting as if any one of them has any authority to act on behalf of or interest in Optimation, Inc. or its enterprises or assets, or (ii) claiming any interest or right in the revenues generated by enterprises (such as Optimation USA, Inc. or IMSCO Industries, Inc.) using Optimation assets, and directing the Hilders and their entities within 15 days to notify all creditors to their business activities under names of Optimation USA, Inc. and IMSCO, Industries, Inc. of their business address at which those claims can be presented to the Hilders.

76. This was an action defended in bad faith by the Hilders using sham defenses of corporate authority similar to those recognized in <u>Technicorp International II, Inc. v. Johnston</u>, and much as that court recognized, "intended to delay the inevitable day of reckoning, and to enable the defendants to continue mulcting the corporation without detection." <u>Technicorp</u>, 2000 WL 713750 (Del. Ch. 2000). Accordingly, Optimation shall be awarded its attorney's fees on an application submitted with in 15 days. See also <u>Arbitrium (Cayman Islands) Handels v. Johnston</u>, 720 A.2d 542, 546 (Del. Supr. 1998) (corporate litigation attorney's fees awarded for bad faith defense of action).

## COUNT J–VIOLATION OF SECURITIES LAWS

77. Plaintiff Optimation does not raise this claim in their proposed findings of fact

and conclusions of law. As the Court has already found that the merger/sale between Optimation and Texas OUSA was void ab initio, this claim is moot.

## COUNTERCLAIM–COUNT I

78. This claim was asserted by Texas OUSA. As the Court has already found that the merger/sale between Optimation and Texas OUSA was void ab initio, Texas OUSA has no standing to bring a counterclaim against Michael Lundy and this claim is DISMISSED. As this claim has been dismissed, Michael Lundy's Motion for Judgment as a Matter of Law on Count I of Counterclaim (Doc. No. 236) is **DENIED AS MOOT.**

**D. REMAINING DAMAGES ISSUES**

The Court will hold a teleconference with the parties on February 9, 2006 at 9:00 a.m. to discuss with the parties the following issues: anticipated length of time to complete accounting; whether additional discovery is necessary; a briefing schedule on disgorgement damages; whether a hearing will be necessary on disgorgement damages; and the scheduling of said hearing if necessary. Counsel for plaintiffs shall initiate the teleconference to the Court at telephone number 816/512-5630.

**IT IS SO ORDERED.**

/s/ Fernando J. Gaitan, Jr.
Fernando J. Gaitan, Jr.
United States District Judge

Dated:_January 24, 2006_
Kansas City, Missouri

17